**Daniel P. KREBS and Cristen M. Krebs, Appellants,**

v.

**UNITED REFINING COMPANY OF PENNSYLVANIA D/B/A Kwik–Fill, Appellee.**

Superior Court of Pennsylvania.

Argued May 25, 2005.

Filed Feb. 16, 2006.

James W. Carroll, Jr., Pittsburgh, for appellants.

Steven C. Beckman, Erie, for appellee.

BEFORE: HUDOCK, ORIE MELVIN, and McCAFFERY, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellants, Daniel P. Krebs and Cristen M. Krebs, appeal from the judg-

ment entered February 12, 2004, in the Court of Common Pleas of Butler County, following a jury verdict in their favor on counts in common law nuisance, negligence, trespass, and liability under the Storage Tank and Spill Prevention Act ("STSPA").[1] Specifically, Appellants allege that three interlocutory orders issued by the trial court during the course of litigation are erroneous and served to significantly reduce their recovery. These orders are: 1) the January 25, 2002 order denying Appellants' motion to enforce a settlement agreement; 2) the December 2, 2003 order denying Appellants' motion for attorneys' fees and costs; and 3) the December 2, 2003 order granting in part and denying in part Appellants' motion for delay damages.[2] For the reasons set forth below, we vacate in part the judgment of the trial court, and remand this matter with instructions to revisit the issues of attorneys' fees and costs and delay damages, and arrive at a determination on these issues in a manner consistent with this opinion. In all other respects, the judgment is affirmed.

¶ 2 Appellants lived immediately adjacent to a Kwik–Fill Service Station owned by Appellee, United Refining Company, in Evans City, Pennsylvania.[3] The station's three underground gasoline storage tanks were situated approximately 75 feet from Appellants' house. (Notes of Testimony ("N.T."), 5/5/03, at 57–58, 91–92; R.R. at 262a–263a, 289a–290a). In the summer of 1994, Appellants began to notice a persis-

tent musty odor in their basement, which, by March 15, 1995, they determined came from gasoline fumes. (*Id.* at 61, R.R. at 265a). By the next day, the odor emanating from the basement had spread to every room in the house. Appellants immediately reported the problem to employees at the Kwik–Fill Station and evacuated the house with their children. (*Id.* at 63–66, 69–71; R.R. at 267a–270a, 273a–275a). Appellants were informed that day by an individual working at the station that a gas leak in the station's underground storage system had been previously detected on February 20, 1995. (*Id.* at 66; R.R. at 270a).

¶ 3 Evidence admitted at trial established that the gasoline fumes originated from a leak in the station's underground storage tanks and their lines, and that Appellee had indeed first detected this leak in February 1995. (N.T., 5/7/03, at 121–122, 130; R.R. at 419a–420a). Approximately 200 to 300 gallons of gasoline had spilled before the leak was sealed. (*Id.* at 205–206; R.R. at 434a–435a). The gasoline fumes detected by Appellants entered into their basement through a sewer line, and on March 19, 1995, testing at Appellants' house confirmed high levels of benzene, a carcinogen. (N.T., 5/6/03, at 116–119; R.R. at 319a–322a). Upon learning of the problem from Appellants, Appellee took remedial steps to correct and prevent any additional leaking (*Id.* at 115–116; R.R. at 318a–319a), and the Department of Environmental Protection

---

1. 35 P.S. §§ 6021.101–2104.

2. Procedurally, Appellants filed a single appeal from these interlocutory orders. Although the appeal was filed prior to the entry of judgment, jurisdiction was perfected upon the docketing of the final judgment in this case. *See Hart v. Arnold*, 884 A.2d 316, 325, n. 2 (Pa.Super.2005); Pa.R.A.P. 905(a). Because the docket reflects that judgment was

entered, we may review Appellants' issues. *Hart, supra;* Pa.R.A.P. 905(a), *supra.*

3. We take the facts and procedural history of this case from three trial court opinions and the certified record. The trial court opinions are as follows: Trial Court Opinion, dated January 25, 2002, at 1–2; and Trial Court Opinions, each dated December 2, 2003, each at 1–2.

("DEP") was notified of the spill. (*Id.* at 137; R.R. at 327a).

¶ 4 After Appellee refused Appellants' written request for compensation beyond the substantial remediation efforts which Appellee had taken with respect to Appellants' property, Appellants commenced litigation by filing a complaint on March 10, 1997, seeking recovery against Appellee under theories of common law nuisance, negligence, trespass, and liability under the STSPA. At a 1999 pre-trial conference, Appellee offered Appellants $30,000 in settlement. Appellants declined the offer, but the parties agreed to postpone litigation in order to mediate their dispute.

¶ 5 On March 22, 2000, the parties participated in a full-day mediation session, but were unable to reach an agreement on the underlying issues. (N.T., 10/20/00, at 85, 197; R.R. at 201a, 245a). A written mediation agreement executed by the parties on that date, however, expressly provided that "no settlement is final and/or binding until formal documents are fully executed or a final Order of Court is entered." (Mediation Agreement, dated 3/22/00, at 1; R.R. at 104a). The parties continued to discuss settlement of the case, and eventually orally agreed to generally settle the dispute for $187,500. (N.T., 10/20/00, at 92–93; R.R. at 204a–205a). No written settlement agreement was executed, however, because the parties could not agree on the issue of the extent of the release Appellants would grant Appellee in exchange for the settlement amount. Appellee sought a release which would cover claims including any potential future personal injuries attributable to the gasoline leak. Appellants specifically wanted to reserve the right to bring any potential future medical claims to cover any latent illnesses possibly caused by exposure to the gasoline fumes. (*Id.* at 94–95, 198–199; R.R. at 206a–207a, 246a–247a). Appellants ultimately filed a motion to enforce settlement, which the trial court denied by opinion and order dated January 25, 2002.

¶ 6 The parties having failed to resolve their differences, a jury trial in this matter commenced on May 5, 2003, presided over by the Honorable William R. Shaffer. At the conclusion of Appellants' four-day case-in-chief, Appellants moved for a directed verdict, at which point Appellee conceded liability. The trial court accordingly found Appellee liable on all counts, leaving the issue of damages for the jury to resolve. (N.T., 5/8/05, at 70; R.R. at 449a). The jury awarded Appellants $37,000 as compensation for their loss of enjoyment and use of land, and for discomfort and annoyance.

¶ 7 Appellants thereafter filed motions for attorneys' fees of $275,378 and costs of $13,345.79, pursuant to Section 1305(f) of the STSPA, 35 P.S. § 6021.1305(f), and delay damages in the amount of $16,165.66 pursuant to Pa.R.C.P. 238. On December 2, 2003, the trial court entered two orders, one denying Appellants' motion for attorneys' fees and costs in its entirety, and one awarding delay damages of only $5,199.26. In arriving at its decision to deny attorneys' fees and costs under the STSPA, the trial court reasoned that such relief was unwarranted because (1) Appellants failed to show a *compelling reason* why such relief was justified, particularly when Appellee took remedial measures to clean and repair Appellants' property in conformance with DEP regulations; and (2) Appellants' fee agreement with their attorney was on a contingency basis, and therefore Appellants purportedly "absorbed no cost to themselves in enforcing this action." (Trial Court Opinion, dated 12/2/03 (re: attorneys' fees and costs), at 4).

¶ 8 In arriving at its decision to limit delay damages to $5,199.26, the trial court

rejected Appellants' argument that such damages should be calculated for the period commencing one year after the date of service of the complaint through the date of the verdict. Instead, the trial court determined that Appellee's offer of $30,000, made on October 7, 1999, at the pre-trial conference, was sufficient under Rule 238 to exclude the period of time from October 7, 1999, until the date of the verdict, from the calculation for delay damages.

¶ 9 This timely appeal ensued in which Appellants raise the following issues for our review:

A. DID THE TRIAL COURT ERR IN DENYING [APPELLANTS'] MOTION TO ENFORCE SETTLEMENT AGREEMENT WHERE [APPELLEE] ADMITTED ON THE RECORD ALL OF THE ESSENTIAL TERMS OF THE AGREEMENT AND WHERE A MEDIATION AGREEMENT SIGNED BY THE PARTIES RECOGNIZED THAT A SETTLEMENT WAS FINAL UPON THE ENTRY OF AN ORDER OF COURT?

B. DID THE TRIAL COURT ERR IN REFUSING TO AWARD ANY ATTORNEY'S FEES UNDER THE STORAGE TANK SPILL PROTECTION ACT, 35 P.S. § 6021.1305(f) ABSENT A SHOWING OF COMPELLING REASON SIMPLY BECAUSE [APPELLANTS] ENTERED INTO A CONTINGENCY AGREEMENT WITH THEIR ATTORNEYS?

C. DID THE TRIAL COURT ERR IN HOLDING THAT AN ORAL SETTLEMENT OFFER SUSPENDED [APPELLEE'S] OBLIGATION TO PAY DELAY DAMAGES, WHEN THE OFFER WAS NOT EXPRESSLY HELD OPEN FOR 90 DAYS AS REQUIRED BY PA.R.CIV.P. 238(b)(1) AND WAS NOT WITHIN 125% OF THE VERDICT WHEN [APPELLEE'S] RESPONSIBILITY FOR ATTORNEY'S FEES WAS CONSIDERED?

(Appellants' Brief at 4). We will address these issues *seriatim.*

### A. Enforcement of Settlement Agreement

¶ 10 Appellants first argue that the trial court erred by refusing to enforce an agreement between the parties to settle the case. Appellants contend that the parties orally agreed on April 11, 2000, that Appellee would pay, or have released from a fund created under the STSPA, the sum of $187,500 in exchange for a release of all claims under Appellants' amended complaint.[4] Appellants further contend that by agreeing to settle all claims under the amended complaint, the parties intended to *exclude* from settlement any claims for future personal injuries resulting from exposure to gasoline fumes, should any such injuries materialize.

¶ 11 Moreover, Appellants argue that an oral settlement agreement, where the parties have agreed to essential terms, is enforceable by the court even when the parties are later unable to agree upon and execute a written agreement, citing *Com-*

---

**4.** Section 704 of the STSPA, 35 P.S. § 6021.704, established the Underground Storage Tank Indemnification Fund ("USTIF"), to be funded from fees and penalties authorized and collected under the STSPA. The USTIF was created to provide payment to owners, operators, and certified tank installers of underground storage tanks who incur liability for taking corrective action or for bodily injury and property damage caused by a leak. 35 P.S. § 6021.704(a)(1).

*pu Forms Control, Inc. v. Altus Group, Inc.*, 393 Pa.Super. 294, 574 A.2d 618 (1990) (holding that parties to a commercial dispute entered into a binding agreement when they set forth the essential terms of settlement on the court record, although they were later unable to agree upon a writing that set forth all terms of the agreement). Appellants thus contend that the trial court erred by (1) finding that the parties had not agreed to all of the essential terms of a settlement agreement; and (2) determining that no settlement agreement could be enforceable unless set forth in writing, in accordance with the March 22, 2000 Mediation Agreement executed by the parties herein. (Appellants' Brief at 19–23). We disagree with Appellants' arguments.

¶ 12 The enforceability of settlement agreements is determined according to principles of contract law. *Yaros v. Trustees of the University of Pennsylvania*, 742 A.2d 1118, 1122 (Pa.Super.1999). When oral contracts are disputed, the issues of what was said, done, and agreed upon by the parties are ones of fact to be determined by the fact finder. *Id.* Also, the question of the intent of the parties is a factual one reserved to the province of the fact finder. *McDonnell v. Ford Motor Company*, 434 Pa.Super. 439, 643 A.2d 1102, 1105–06 (1994) (citation omitted).

¶ 13 As a reviewing court, we will not disturb the findings of a trial judge sitting as fact finder unless we determine that the court's findings are not based on competent evidence of record. *Yaros, supra* at 1124. Further, in reviewing a trial court's factual findings, the evidence is to be viewed in a light most favorable to the party that prevailed below, rejecting all inferences arising from the evidence that are unfavorable to the prevailing party. *Id.* While we will enforce oral settlement agreements even when the parties have failed to execute a written agreement, we will do so only if the parties have agreed upon the essential terms of the agreement. *McDonnell, supra; Compu Forms, supra* at 624. We would also note that for a contract to be enforceable, the nature and extent of the mutual obligations must be certain, and the parties must have agreed on the material and necessary details of their bargain. *Peck v. Delaware County Board of Prison Inspectors*, 572 Pa. 249, 260, 814 A.2d 185, 191 (2002) (citing *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 393, 123 A.2d 663, 666 (1956)). When performance under a contract is uncertain, the court will not write the contract for the parties. *Turner v. Hostetler*, 359 Pa.Super. 167, 518 A.2d 833, 836 (1986).

¶ 14 Here, the trial court found as a fact that the parties never agreed to terms essential to the formation of an agreement. The evidence wholly supports this finding. The record belies Appellants' assertion that any agreement by Appellee to settle all claims arising under Appellants' amended complaint excluded claims for possible future personal injuries. Appellee specifically sought a release from, among other things, all claims for personal injuries now existing and potentially coming into existence in the future, as a result of exposure to gasoline fumes. Appellants were *not* willing to release Appellee from claims for any such potential future personal injuries. (N.T., 10/20/00, at 94–95, 198–199; R.R. at 206a–207a, 246a–247a). Count IV of the amended complaint specifically alleges that Appellants have suffered, as a result of their exposure to Appellee's gas spill, a "significantly increased risk of contracting a serious latent disease ... that makes periodic diagnostic medical examination, monitoring and testing ... reasonably nec-

essary," [5] and that Appellee's acts are a "proximate cause of [Appellants'] past and *future* medical expenses [and] medical surveillance costs." [6] Further, the amended complaint specifically requests damages for "[p]ast and *future* medical expenses [and] medical surveillance costs." [7] Thus, had the parties agreed upon a settlement of all claims under the amended complaint, those claims would appear to include claims for potential damages arising from possible future physical injuries related to exposure to gasoline fumes.

¶ 15 More importantly, however, the correspondence set forth in the record clearly reflects that a meeting of the minds as to the terms of a release never occurred. Appellants allege that the parties reached a settlement agreement on April 11, 2000.[8] Yet, by letter dated April 26, 2000, Appellants' attorney asked Appellee's attorney to review a proposed release agreement and to let Appellants' attorney "know if it is acceptable [as] I have not had my clients review this yet and I will not do so until you have indicated to me that it is acceptable." [9] Thus, contrary to Appellants' assertions that a full agreement had been reached two weeks before their attorney wrote this letter, this letter shows that the parties had not come to an agreement regarding the scope and nature of the release.

¶ 16 Subsequent correspondence continues to reflect the unresolved differences between the parties. By letter dated May 8, 2000, Appellants' attorney expressed frustration to Appellee's attorney concerning Appellee's steadfast position that the release must or should include Appellants' future medical claims. Denying that the amended complaint included potential claims for personal injuries or medical expenses associated with future medical injuries, Appellants' attorney flatly stated that Appellants would not entertain a settlement that included a release of future medical claims.[10]

¶ 17 By letter dated May 9, 2000, Appellee's attorney replied that its settlement proposal was meant to cover all claims in the amended complaint, including claims for future medical expenses, thus contradicting Appellants' interpretation that their pleading omitted such claims. Appellee's attorney insisted that any release would have to include *all* claims in order to preclude future litigation related to the injuries Appellants allegedly suffered as a result of the gas spill.[11] Moreover, affidavits executed by George W. Chapman,[12] Kerry L. Youndt,[13] and Timothy D. Ruth,[14]

5.  (First Amended Complaint, filed 4/29/97, at ¶ 43; R.R. at 28a).

6.  (*Id.* at ¶ 45; R.R. at 28a; emphasis added).

7.  (*Id.*, Damages, at ¶ 4; R.R. 30a; emphasis added).

8.  (Appellants' Brief at 10, 12).

9.  (Appellants' Motion to Enforce Settlement Agreement, filed May 25, 2000, Exhibit "C", at 1; R.R. at 63a).

10.  (*Id.*, Exhibit "D", at 1–2; R.R. at 64a–65a).

11.  (*Id.*, Exhibit "E", at 1–2; R.R. at 66a–67a).

12.  George W. Chapman is the Claims Manager for the Pennsylvania USTIF, who had authority in this case to approve all settlements and releases involving disbursements from the USTIF. (Chapman Affidavit at 1–2; R.R. at 105a–106a).

13.  Kerry L. Youndt is a claims manager for a third-party administrator of the USTIF, who oversaw settlement discussions in this case. (Youndt Affidavit at 1; R.R. at 110a).

14.  Timothy D. Ruth is the director of environmental operations for Appellee, and was involved in settlement discussions in this case. (Ruth Affidavit at 1–2; R.R. at 114a–115a).

all declared that the settlement discussions between the parties concerned a release of *all* claims. In fact, Mr. Chapman affirmed that he would not have authorized a $187,500 settlement with funds from the USTIF unless it involved all claims arising from the lawsuit.[15]

¶ 18 Accordingly, the evidence before the trial court completely supports its finding that the parties had failed to achieve a meeting of the minds as to the critical issue of the scope and extent of a settlement release. As the proposed settlement agreement lacked necessary terms, the trial court was prohibited from "filling these terms in" and enforcing an agreement of its own devising. *Peck, supra; Turner, supra.*

¶ 19 Further, the trial court correctly determined that the parties had agreed that "no settlement is final and/or binding until formal documents are fully executed or a final Order of Court is entered." (Mediation Agreement at 1; R.R. at 104a). Appellants argue that, as the parties had failed to achieve a written settlement agreement, the operative phrase of this sentence defaults to "a final Order of the Court." Appellants contend that *Compu Forms, supra,* provides authority for the trial court to enforce an oral settlement agreement even in the face of the parties' inability to arrive at a written settlement agreement.

¶ 20 In *Compu Forms,* however, the trial court made the factual finding that the parties had agreed to enter into an enforceable *oral* settlement agreement because the parties had previously set forth the terms of the agreement on the court record. Further, the court found that although a written agreement had been contemplated, neither party stated on the record that a contract would not exist unless

one was reduced to writing. On appellate review, we determined that the settlement terms on the record established that the parties had agreed upon the necessary consideration for their agreement, and that the disputed term preventing the creation of a written contract was not an essential term, but an additional term which one of the parties had simply failed to insist upon when the contractual terms were set forth on the record in court. *Compu Forms, supra* at 622–24.

¶ 21 Here, by contrast, essential settlement terms were never placed on the record, the extent of the release to be given in exchange for a settlement figure was never agreed upon, and consideration was thus lacking in the agreement, and the parties had explicitly agreed that the settlement must be in writing to be enforceable. Therefore, *Compu Forms* does not support Appellants' argument that the trial court had authority to enforce an agreement under the facts of the case *sub judice.* Contrary to Appellants' contentions, essential terms of a settlement are lacking, and Appellants simply desired that the trial court enforce an agreement with terms that they alone wished to include in the settlement agreement. The trial court did not err by declining to create and enforce such an agreement.

## B. Attorneys' Fees and Costs

■ ¶ 22 Appellants next argue that the trial court abused its discretion by denying them an award of attorneys' fees and costs pursuant to Section 1305(f) of the STSPA. Appellants contend that the trial court erred when it based its denial of fees and costs on 1) Appellants' failure to show "compelling reasons" to justify an award of such fees and costs; 2) Appellants' contingency fee agreement with counsel; and 3) a disregard of purported Pennsylvania law

15. (Chapman Affidavit at ¶ 14; R.R. at 109a).

holding that fee-shifting provisions of statutes such as the STSPA virtually mandate an award of fees to prevailing plaintiffs. We agree that the trial court's determination to deny an award of attorneys' fees and costs was based on improper factors, and that the court failed to properly evaluate Appellants' request for attorneys' fees and costs under the STSPA.

¶ 23 Section 1305 of the STSPA, 35 P.S. § 6021.1305, entitled "Suits to abate nuisances and restrain violations," sets forth certain enforcement mechanisms under the STSPA. Section 1305 provides for actions by the DEP and also private individuals to "compel compliance" with the act. Under Section 1305(c), a private individual may bring a cause of action to collect costs for cleanup and diminution in property value against a party responsible for a spill of a regulated substance.[16] *Centolanza v. Lehigh Valley Dairies, Inc.*, 540 Pa. 398, 407, 658 A.2d 336, 340 (1995). Further, under this section, a private individual may also bring an action for personal injury caused by a violation of the STSPA. *Wack v. Farmland Industries, Inc.*, 744 A.2d 265, 268 (Pa.Super.1999). Additionally, this section directs the court to award attorneys' fees and costs, when appropriate, as follows:

> **(f) Fees and costs.**—The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including attorney and expert witness fees) to any party, whenever the court determines such award is appropriate. Except as provided in subsection (b), the court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in

accord with the Rules of Civil Procedure.

35 P.S. § 6021.1305(f).

¶ 24 Section 1305(f) provides that attorneys' fees and costs may be awarded to **any** party, be it the Commonwealth or a private person. This section does not *mandate* an award of attorneys' fees, but by use of the term "may", signals the legislative intent that an award of attorneys' fees and costs rests within the sound discretion of the trial court. *See Hoy v. Angelone*, 554 Pa. 134, 147, 720 A.2d 745, 751 (1998). An abuse of discretion generally will not be found unless there is "a showing of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous." *Id.* at 148, 720 A.2d at 752 (quoting *Paden v. Baker Concrete Construction, Inc.*, 540 Pa. 409, 412, 658 A.2d 341, 343 (1995)).

¶ 25 The trial court's discretion is tempered under Section 1305(f), however, by the requirement that the court determine whether an award is "appropriate." The STSPA does not define when an award of attorneys' fees and costs will be appropriate, nor does it define how such fees and costs are to be calculated. Therefore, we must decipher the General Assembly's intent with respect to these issues through statutory analysis and, as there is no controlling case law interpreting the application of Section 1305(f), review of case law interpreting similar "fee-shifting" statutory provisions. *See generally Centolanza, supra* at 405–06, 658 A.2d at 340 (construing the legislative purpose of the STSPA in the absence of a statutory definition of the operative phrase controlling the scope of private actions under the act); and *Department of Environmental Resources v.*

---

**16.** Section 103 of the STSPA defines "regulated substance" as including gasoline and other petroleum products. 35 P.S. § 6021.103.

*PBS Coals, Inc.*, 677 A.2d 868, 873 (Pa. Cmwlth.1996) (construing the legislative intent of two environmental statutes in the absence of statutory guidance as to how attorneys' fees are to be calculated under fee-shifting provisions in those acts).[17]

¶ 26 As our review of the STSPA is one of law, our standard of review is *de novo* and our scope of review is plenary. *Sternlicht v. Sternlicht*, 583 Pa. 149, 156, 876 A.2d 904, 908 (2005). When construing a statute, we are guided by the principles set forth in the Statutory Construction Act of 1972, 1 Pa.C.S.A. §§ 1501–1991. *Centolanza, supra* at 404, 658 A.2d at 339. Relevant to our review are the provisions set forth at 1 Pa.C.S.A. § 1921, concerning legislative intent. Section 1921 provides:

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

We are further aided in our review of the STSPA by our Supreme Court's previous exploration of this statute in *Centolanza, supra*. There, the high court determined that the STSPA is a remedial statute and, as such, requires that any ambiguous language contained therein be construed "liberally" in order to effectuate the legislative intent. *Id.* at 406, 658 A.2d at 340.

¶ 27 The General Assembly's intent in enacting the STSPA is set forth at Section 102 of the STSPA, 35 P.S. § 6021.102. Section 102(b) provides:

**Declaration.**—The General Assembly declares ... storage tank releases to be a threat to the public health and safety of this Commonwealth and hereby exercises the power of the Commonwealth to prevent the occurrence of these releases through the establishment of a regulatory scheme for the storage of regulated substances in new and existing storage tanks and to provide liability for damages sustained within this Commonwealth as a result of a release and to require prompt cleanup and removal of such pollution and released regulated substance.

35 P.S. § 6021.102(b).

¶ 28 With this legislative intent in mind, our Supreme Court explained that when construing an ambiguous provision of the STSPA, the construction of that provision must be given "teeth to realize the goals of the General Assembly." *Centolanza, supra* at 407, 658 A.2d at 340. Thus, in

---

**17.** Although *PBS Coals* is a decision of the Commonwealth Court, and therefore not binding upon this Court, we find its guidance instructive and persuasive.

*Centolanza,* the Court determined that, in order to effectuate the purposes of the STSPA, Section 1305(c)'s rather ambiguous direction permitting private citizens to bring actions to "compel compliance" with the STSPA, permits private actions to collect costs for cleanup of spills and diminution of property value. *Id.*

¶ 29 Since the STSPA gives no guidance as to when it is "appropriate" to award attorneys' fees and costs under Section 1305(f), we are also required to construe this provision liberally, so that Section 1305(f) has the requisite "teeth" to help realize the STSPA's goals of preventing, providing liability for, and collecting costs of cleanup related to storage tank spills in the Commonwealth. A construction of Section 1305(f) that enhances the goals of the General Assembly is also in complete harmony with cases interpreting fee-shifting provisions in other Pennsylvania remedial statutes. As will be seen, these cases hold generally that where the General Assembly has departed from the "American Rule" (where each party is responsible for his or her own attorneys' fees and costs), by providing a fee-shifting remedy in a remedial statute, the trial court's discretionary award or denial of attorneys' fees must be made in a manner consistent with the aims and purposes of that statute. *See e.g. Krassnoski v. Rosey,* 454 Pa.Super. 78, 684 A.2d 635, 637–38 (1996).

¶ 30 In *Krassnoski,* we determined that the inclusion of a fee-shifting provision in a remedial statute signals the General Assembly's intent "to encourage potential plaintiffs to seek vindication of important rights and to deter defendants from conduct violating those rights." *Id.* at 637–38 (citation omitted). Thus, even if a fee-shifting provision places an award of attorneys' fees and costs in the trial court's

discretion, that court must nevertheless exercise its discretion within the framework of the legislative purpose behind the enactment of the fee-shifting provision. *Id.* at 638. As we determined in *Krassnoski* with regard to the fee-shifting provision of the Protection from Abuse Act,[18] which also provided for a discretionary award of attorneys' fees:

> [W]here counsel fees are statutorily authorized in order to promote the purposes of a particular legislative scheme, the trial court should not determine the appropriateness of counsel fees under the general standards applicable in all litigation. Rather, it should consider whether an award of fees would, in the circumstances of the particular case under consideration, promote the purposes of the specific statute involved. Thus, the trial court should have focused ... upon whether, under all the circumstances of this case, an award of counsel fees in this case would serve the ... Act's purposes....

*Id.* at 639.

¶ 31 Based on this rationale, we determined that attorneys' fees are appropriately awarded under a fee-shifting statutory provision, even though the attorney prosecuted an action under the Act on behalf of a plaintiff *free of charge.* *Id.* at 638. As we explained:

> Viewed within the context of [the] overall statutory scheme, the purpose of the legislature in including in the Protection from Abuse Act a provision permitting awards of counsel fees becomes apparent: first to encourage victims of domestic abuse, who are often financially dependent upon their abusers, to take advantage of the protections offered by the Act; and second, to include a financial disincentive among the Act's arsenal

18. 23 Pa.C.S.A. §§ 6101–6118.

of weapons designed to deter abusers from further abusive conduct.

These twin purposes of counsel fees awards under the ... Act are served equally well whether the award is made to reimburse a plaintiff who has paid counsel to prosecute an action or directly to plaintiff's counsel who has prosecuted the action free of charge. Awards of fees to counsel willing to prosecute protection from abuse actions without prior payment encourages private counsel to accept such cases..., Moreover, because the financial impact upon the defendant is the same regardless of the recipient of the award of counsel fees, the potential deterrent effect of counsel fees awards remains the same if awards are authorized in cases where the plaintiff has been represented free of charge.

*Id.* (footnote omitted).

¶ 32 Similarly, in *Logan v. Marks,* 704 A.2d 671 (Pa.Super.1997), we reviewed the policy considerations for calculating attorneys' fees in cases brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, in Pennsylvania courts. In *Logan,* we concluded that a trial court's discretion in awarding attorneys' fees in cases brought under the Civil Rights Act, pursuant to the fee-shifting provisions of 42 U.S.C. § 1988,[19] was "not limitless," as the "prevailing party should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Id.* at 673 (quoting *Blanchard v. Bergeron,* 489 U.S. 87, 89 n. 1, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989)). Additionally, we determined that a decision to deny attorneys' fees under fee-shifting provisions would "be re-versed if based on an incorrect view of the law." *Id.* (citations omitted).

¶ 33 In *Logan,* we concluded that the trial court's denial of attorneys' fees was erroneously based on the fact that the prevailing plaintiff received only a modest jury award of $275 for compensatory damages and $1 for punitive damages. We concluded that the plaintiff achieved more than a technical victory in that he had established a violation of his civil rights, resulting in some damages. We also noted well-established federal court precedent that a trial court lacks the discretion to deny attorneys' fees in a civil rights action "merely because the recovery is disproportionate to the fee claimed." *Id.* (citations omitted). Accordingly, we remanded the case to the trial court for it to revisit the issue of awarding attorneys' fees, with the following instructions:

[T]he degree of success is the critical consideration in determining an appropriate fee award. The court may not lower the fee to achieve proportionality with the size of the verdict. The court may consider the relationship between the damages sought and those recovered.... The degree of success cannot be measured simply in monetary terms, [however,] as the jury's verdict also involves the vindication of an invaluable constitutional and civil right. Also, the court should factor the deterrent effect of the jury's verdict and the potential public benefit inherent in one individual's challenge [to enforce guaranteed civil rights]. Finally, the court should consider the purpose of [the fee-shifting provisions] of § 1988 to cure the inadequacy of private fee arrangements to

---

19. The Civil Rights Attorney's Fees Awards Act of 1976, codified at 42 U.S.C. § 1988(b), provides, in pertinent part:

In any action or proceeding to enforce a provision of sections 1981, 1981(a), 1982, 1983, 1985 and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs....

ensure vigorous enforcement of civil rights. To this end, an appropriate fee should be sufficient to attract competent counsel who might otherwise reject similar claims.

*Id.* at 674 (citations omitted).

¶ 34 The Commonwealth Court, in a matter with similarities to the case *sub judice,* considered the issue of whether an award of attorneys' fees, under the fee-shifting provisions of the Clean Streams Law [20] and the Surface Mining Conservation and Reclamation Act,[21] must be limited to the same percentage of recovery as that reflected in a contingency fee agreement between the prevailing plaintiff and his or her attorney. *PBS Coals, supra.* As there was no Pennsylvania law interpreting these fee-shifting provisions, the Commonwealth Court turned to federal court interpretations of the Clean Water Act,[22] a federal statute with similar purposes to, and a nearly identical fee-shifting provision as the Clean Streams Law. *Id.* at 873–74. The Court noted that under the Clean Water Act, and indeed under all federal fee-shifting statutes, reasonable attorneys' fees were essentially calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. The product of this equation is known as the "lodestar." *Id.* at 874. The Court noted that under federal fee-shifting statutes, there is a "strong presumption" that the lodestar represents a reasonable fee. *Id.* (quotation and citations omitted).

¶ 35 Accordingly, federal law rejected a limitation of an award of attorneys' fees based on a contingency fee agreement between the prevailing plaintiff and counsel. Rather, the contingency agreement was seen as simply a factor to be considered by the trial court in determining the reasonableness of an award of attorneys' fees because it can aid in demonstrating an attorney's remunerative expectations. The contingency percentage, however, could not be used as a ceiling when applied to the jury verdict; otherwise the purposes of the statute allowing for fees could very easily be frustrated. *Id.* at 874–75. Thus, the United States Supreme Court warned against an undesirable emphasis on the recovery of damages in fee-shifting cases, at the expense of focusing upon the intent of the statute. The Supreme Court noted that an approach that emphasizes financial recovery could serve as a disincentive for attorneys to pursue actions under remedial statutes where the financial recovery may be low, or where successful litigation under the statute may result in a declaratory judgment or injunction. *Id.* at 875 (quoting *Blanchard, supra,* at 95–96, 109 S.Ct. 939). The Commonwealth Court found the analysis of the federal decisions instructive, and adopted that analysis in rejecting the trial court's application of a contingency fee agreement as a limitation on the amount of recovery of attorneys' fees under a fee-shifting provision, noting that a contingency fee agreement is but one of many factors to consider in arriving at an award of a reasonable attorneys' fee.

¶ 36 This Court has also held that, as a general rule, the method of determining reasonable attorneys' fees under fee-shifting provisions in Pennsylvania is the lodestar approach, whereby the lodestar figure may be adjusted, in the discretion of the trial court, "in light of the degree of success, the potential public benefit achieved, and the potential inadequacy of the private fee arrangement." *Signora v. Liberty Travel, Inc.,* 886 A.2d 284, 293 (Pa.Su-

---

**20.**  35 P.S. § 691.601(g).

**21.**  52 P.S. § 1396.18c(e).

**22.**  33 U.S.C. § 1251 *et seq.*

per.2005) (citing *Logan, supra,* at 674). Therefore, we agree with the Commonwealth Court that it would be inappropriate to apply a contingency fee agreement to create a ceiling (or for that matter, a closed door) on the recovery of attorneys' fees under a fee-shifting provision of a remedial statute.

¶ 37 We also find the Commonwealth Court's analysis in *PBS Coals, supra,* instructive and persuasive based on our observation that the fee-shifting provisions of the Clean Streams Law and the Surface Mining Conservation and Reclamation Act, are identical to those set forth at Section 1305(f) of the STSPA, and that all three statutes were enacted with the intent to prevent or remediate environmental harm. In fact, all three statutes allow for private causes of action under statutory sections that are virtually identical.[23] Thus, the fee-shifting provisions of these three statutes should be interpreted in a consistent manner.

¶ 38 Based on the above analysis, we can draw the following principles. First, Section 1305(f) authorizes an award of attorneys' fees to *any* person, whether the Commonwealth or a private party, and this section makes no distinction between the Commonwealth and private parties with regard to the standards under which an award of attorneys' fees becomes appropriate. Second, the decision to award attorneys' fees and costs under Section 1305(f) rests in the sound discretion of the trial court, but such discretion is "not limitless", and attorneys' fees should be awarded in appropriate circumstances. Third, a determination of the appropriateness of an award of attorneys' fees under Section 1305(f) should not be based on the general standards applicable to all litigation, but should be based, under the circumstances of the particular case, on whether an award of fees and costs would promote the purposes of the STSPA. Fourth, the purposes of the STSPA are set forth at Section 102, and include the protection of the public health and safety by providing for, among other things, liability for damages sustained from storage tank releases and prompt cleanup and removal of pollution resulting from such releases. Fifth, the trial court, in determining the appropriateness of awarding attorneys' fees and costs under Section 1305(f), should consider that a purpose of its fee-shifting arrangement is to cure potential inadequacy of private fee arrangements in order to ensure vigorous enforcement of the STSPA and to attract competent counsel who might otherwise reject similar claims. Sixth, although the degree of success is the critical consideration in determining an appropriate fee award, the trial court should not lower the fee to achieve proportionality with the size of the verdict, as the degree of success is not measured simply in monetary terms. Seventh, the method of determining reasonable attorneys' fees under Section 1305(f) is the lodestar approach, whereby the lodestar figure may be adjusted, in the discretion of the trial court, in light of the degree of success, the potential public benefit achieved, and the potential inadequacy of the private fee arrangement. Eighth, a contingency agreement may be viewed as a factor in the trial court's determination of the *amount* of attorneys' fees awarded under Section 1305(f), but it cannot serve as an artificial ceiling based on the percentage agreed upon between attorney and client. We do not intend this list to be exhaustive.

¶ 39 Turning to the case *sub judice,* we observe that the trial court based its decision to deny attorneys' fees and costs on matters inconsistent with the above princi-

---

**23.** *Compare* 35 P.S. § 6021.1305(c); 35 P.S. § 691.601(c); and 52 P.S. § 1396.18c(a).

ples and the law upon which they are based. The trial court determined that attorneys' fees and costs were unwarranted because Appellants failed to show "a compelling reason" for such an award, and because Appellants had entered into a contingency fee agreement with their counsel. (Trial Court Opinion, dated December 2, 2003 (re: attorneys' fees and costs), at 3–4). The trial court also opined, without specific factual findings from the record, that Appellants' counsel had assumed the risk that the costs of litigation could be above amount of the jury award, and that Appellants "absorbed no cost to themselves in enforcing this action." (*Id.* at 4).

■ ¶ 40 First, no language in Section 1305(f) requires that a party show "compelling reasons" for an award of attorneys' fees and costs.[24] On the contrary, Section 1305(f) states that such fees and costs are to be awarded when "appropriate." As previously discussed, the appropriateness of awarding fees and costs should be based on an analysis of whether the action helped to promote the purposes of the STSPA by, among other things, encouraging private individuals to bring actions, when permitted, to remedy violations of the STSPA and to encourage attorneys to take such cases. The trial court's requirement that a party show compelling reasons to justify an award of attorneys' fees and costs is wholly absent from the clear language of Section 1305(f) and case law interpreting fee-shifting provisions in remedial statutes,

and actually serves to "de-fang" rather than to give teeth to the goals of the STSPA. The trial court, therefore, committed clear error by inserting into Section 1305(f) the additional requirement that a party show compelling reasons to justify an award of attorneys' fees and costs.[25]

■ ¶ 41 Second, the trial court's denial of attorneys' fees and costs based on the Appellants' having entered a contingency fee agreement with their attorney flies in the face of every principle elucidated in the case law discussed above concerning analyses of fee-shifting provisions in remedial statutes. Quite simply, the form of fee arrangement between the prevailing party and counsel will generally have little or nothing to do with whether the purposes of the statute are served in the *decision to award* fees and costs. An award of attorneys' fees and costs may be appropriate even when the attorney has agreed to bring an action under the statute free of charge. *Krassnoski, supra.* Further, a contingency fee agreement may not serve as an artificial ceiling, but it is only one of potentially many factors which should be used to determine the *reasonableness* of attorneys' fees already awarded. *PBS Coals, supra.* Thus, there is no logic to using a contingency fee arrangement as a "closed door" to a statutory provision meant to further the remedial purposes of the statute. As previously discussed, the manner by which attorneys'

---

**24.** The trial court cited *Bruni v. Exxon Corp.,* 52 Pa. D & C.4th 484 (Allegheny Cty.2001), in support of its requirement that Appellants show compelling reasons to justify an award of attorneys' fees and costs. Aside from the fact that *Bruni,* as a decision of the Court of Common Pleas, has no value as precedent, the court in *Bruni* also failed to identify any legal authority for its determination that Section 1305(f) required "compelling reasons" for an award of fees and costs. *Id.* at 501.

**25.** We would also note that Section 1305(f) applies to all parties, including the DEP. One would be hard pressed to conclude, given the clear mandate in STSPA for the DEP to work vigorously to abate storage tank spills and other stated public nuisances, that the DEP would be required to show compelling reasons to justify an award of fees and costs in pursuit of its mandate, when Section 1305(f) conspicuously fails to include such a requirement.

fees are determined in this Commonwealth, under fee-shifting provisions, is the lodestar approach. *Signora, supra.* The trial court, therefore, also committed clear error by denying attorneys' fees and costs under Section 1305(f) on the grounds that Appellants and their counsel had entered into a contingency fee agreement.

¶ 42 Third, the trial court, without explaining the factual basis for its conclusion, stated that because of the contingency fee agreement, Appellants absorbed no cost to themselves with their victory. It is difficult to understand how the trial court could arrive at this conclusion. The trial court made no factual findings regarding the actual fee agreement between Appellants and their counsel. Such agreements, however, typically provide that counsel will take a percentage of thirty-three and one-third or greater from the award or settlement. These agreements also often require that the plaintiff be responsible for the costs of litigation. Thus, under their fee agreement, the costs borne by Appellants, while perhaps not out of pocket, could be quite considerable. As previously discussed, fee-shifting provisions are designed in part to encourage parties to take action to enforce their rights or the important public policy concerns behind the enactment of the statute in which such provisions are contained. The trial court's focus on whether Appellants incurred out-of-pocket expenses as a result of their litigation, besides having no foundation in the factual record, is contrary to the purposes behind the General Assembly's inclusion of a fee-shifting provision in the STSPA. The trial court, therefore, also committed clear error by

denying attorneys' fees and costs based on its conclusion that Appellants' "absorbed no costs to themselves in enforcing" their action.

¶ 43 The trial court, in arriving at its determination to deny fees and costs, did note that Appellee took immediate remedial action when informed of the spill upon Appellants' property, and that Appellee's remediation efforts complied with all applicable DEP requirements. These certainly appear to be legitimate factors for a trial court to consider in arriving at an appropriate award of attorneys' fees and costs under Section 1305(f). The trial court, however, considered these matters within a framework completely at odds with the letter and spirit of Section 1305(f). Moreover, the trial court failed to consider other matters that would appear to support an award of fees and costs, notably the fact that Appellee waited to concede liability until immediately after Appellants had proceeded with the time and expense of presenting their case-in-chief, rather than beforehand,[26] and the fact that the trial court determined that the evidence brought forth at trial supported a charge to the jury on punitive damages.[27]

¶ 44 Accordingly, we determine that the trial court did abuse its discretion in denying attorneys' fees and costs under Section 1305(f), requiring that this issue be remanded to the trial court to be considered under the proper and relevant criteria, as outlined in this opinion.

### C.  Delay Damages

¶ 45 Appellants' final claim is that the trial court erroneously limited the award of delay damages based on Appel-

---

26. A party "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by [the other party] in response." *Logan, supra,* at 673 (quoting *City of Riverside v. Rivera,* 477 U.S. 561, 580 n. 11, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)).

27. (N.T., 5/8/03, at 79; R.R. at 450a; and N.T., 5/9/03, at 93; R.R. at 454a).

lee's offer of settlement that Appellants argue was inadequate to toll damages under Pa.R.C.P. 238.[28] Appellants contend that Appellee's $30,000 offer of settlement made on October 7, 1999, did not remain open for the requisite 90 days and that Appellants' recovery of $37,000 would exceed 125% of the $30,000 offer when added to what Appellants contend are the attorneys' fees that should be awarded to them. For these reasons, Appellants argue that the trial court erred in its calculation of delay damages. (Appellant's Brief at 16, 33–38). Appellants also request that, in the event we remand this matter to the trial court, we instruct that the matter be decided by a different trial judge than the one who made the rulings now on appeal. We agree that the trial court must adjust its award of delay damages, but for rea-

sons different than those advanced by Appellants. We decline to instruct that a new trial judge be assigned to make this adjustment.

¶ 46 We review a ruling under Rule 238 for an abuse of discretion, and we will not reverse a trial court's decision regarding the imposition of delay damages absent such an abuse. *Goldberg ex rel. Goldberg v. Isdaner,* 780 A.2d 654, 659 (Pa.Super.2001). Rule 238 states: "At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant ... found to be liable to the plaintiff ...." Pa.R.C.P. 238(a)(1). The purpose of this rule is to alleviate delay in the courts by providing an incen-

---

28. Rule 238 provides in pertinent part:

(a)(1) At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury, in the decision of the court in a nonjury trial or in the award of arbitrators appointed under section 7361 of the Judicial Code, 42 Pa.C.S. § 7361, and shall become part of the verdict, decision or award.

(2) Damages for delay shall be awarded for the period of time from a date one year after the date original process was first served in the action up to the date of the award, verdict or decision.

(3) Damages for delay shall be calculated at the rate equal to the prime rate as listed in the first edition of the Wall Street Journal published for each calendar year for which the damages are awarded, plus one percent, not compounded.

(b)(1) The period of time for which damages for delay shall be calculated under subdivision (a)(2) shall exclude the period of time, if any,

(i) after the defendant made a written offer which complied with the requirements of

subdivision (b)(2), provided that the plaintiff obtained a recovery which did not exceed the amount described in subdivision (b)(3), or

(ii) during which the plaintiff caused delay of the trial.

(2) The written offer of settlement required by subdivision (b)(1)(i) shall contain **an express clause continuing the offer in effect for at least ninety days or until commencement of trial**, whichever occurs first, and shall either

(i) be in a specified sum with prompt cash payment, or (ii) contain a structured settlement plus any cash payment. An offer that includes a structured settlement shall disclose the terms of payment underwritten by a financially responsible entity, the identity of the underwriter and the cost.

(3) The plaintiff's recovery required by subdivision (b)(1)(i), whether by award, verdict or decision, exclusive of damages for delay, shall not be more than 125 percent of either the specified sum or the cost of the structured settlement plus any cash payment to the plaintiff.

\* \* \*

(f) **This rule shall apply to actions pending on or after the effective date of this rule in which damages for delay have not been determined.**

Pa.R.C.P. 238 (emphasis supplied).

tive and encouragement for defendants to settle meritorious claims as soon as reasonably possible. *Arthur v. Kuchar*, 546 Pa. 12, 18, 682 A.2d 1250, 1253 (1996). The rule provides for delay damages "for the period of time from a date one year after the date original process was first served in the action up to the date of the award, verdict or decision." Pa.R.C.P. 238(a)(2). However, Rule 238(b)(1) *suspends* a defendant's obligation to pay delay damages from the time a *qualifying written* offer of settlement is made.

¶ 47 There are two requirements to bring a settlement offer within the rule's exclusion. First, the written offer of settlement must contain "an express clause continuing the offer in effect for at least ninety days or until commencement of trial, whichever occurs first," and shall provide for either a cash or structured settlement.[29] Pa.R.C.P. 238(b)(2). Second, the plaintiff's recovery (whether by award, verdict or decision, exclusive of delay damages), cannot be more than 125% of the settlement offer. Pa.R.C.P. 238(b)(3). Furthermore, "this rule shall apply to actions pending on or after the effective date of this rule in which damages for delay have not been determined." Pa.R.C.P. 238(f). The phrase "have not been determined" is interpreted to mean that delay damages have not been determined **after exhaustion of all appeals** in a pending case. *Conner v. Munsey*, 533 Pa. 143, 149–150, 620 A.2d 1103, 1106 (1993).

¶ 48 Here, the trial court opined that the prior version of Pa.R.C.P. 238(b)(2) applies to the entire period relevant to the case *sub judice*, as both the amendment and the *Sonlin* decision occurred **after** Appellee

had made the $30,000 offer on October 7, 1999, and that the $30,000 offer did satisfy the requirements of the prior version of Pa.R.C.P. 238(b)(2) for suspending Appellee's liability to pay damages because it had remained open, in fact, for more than 90 days. The trial court thus awarded Appellants delay damages of $5,199.26, representing only the period from March 24, 1998, (one year after Appellants served their complaint), to October 7, 1999, when the $30,000 settlement offer was made. (*See* Trial Court Opinion, dated December 2, 2003 (re: delay damages), at 4–6).

¶ 49 Upon review, we conclude that the October 7, 1999, $30,000 offer validly suspended Appellee's obligation to pay delay damages under the prior version of Rule 238(b)(2) which was still in effect as of October 7, 1999, but that this offer was no longer effective to meet the requirements under new Rule 238(b)(2) which became effective July 29, 2002. Pursuant to the terms of Rule 238(f), revised Rule 238(b)(2) *would apply* to actions pending on or after the effective date of the new rule in which damages for delay "have not been determined." Therefore, Appellee's obligation to pay delay damages **resumed** as of July 29, 2002, the date of the new rule's adoption, as the issue of delay damages had not been determined on that day by either the trial court or on appeal. *See Conner, supra.* This is consistent with the way our Supreme Court has treated earlier revisions to Pa.R.C.P. 238. *See Schrock v. Albert Einstein Medical Center, Daroff Div.*, 527 Pa. 191, 196, 589 A.2d 1103, 1106 (1991) (instructing that Rule 238 as revised in 1988 applied to future actions and to

---

**29.** This requirement was added by an amendment in 2002 incorporating the standards set forth in *Sonlin ex rel. Sonlin v. Abington Memorial Hospital*, 748 A.2d 213, 216 (Pa.Super.2000), and was adopted and made effective immediately on July 29, 2002. Although

a qualified offer was required to remain open for 90 days prior to the 2002 amendment, there was no requirement of an express "written" clause pertaining to how long the offer had to remain open. *Arthur, supra* at 19, 682 A.2d at 1253.

pending actions where delay damages have not yet been determined).

¶ 50 While it would have been unfair to *retroactively* require Appellee's $30,000 offer, made on October 7, 1999, to comply with the new requirements of the revised Pa.R.C.P. 238(b)(2), Appellee should have amended the written offer in accordance with Rule 238(b)(2)'s new requirement, effective July 29, 2002, of setting forth an express clause holding the offer open for at least 90 days, if it wanted the original $30,000 offer to remain effective in suspending Appellee's obligation to pay delay damages under the new rule. However, Appellee did not revise its $30,000 offer. Although Appellee subsequently made an *oral* settlement offer of $187,500 on April 11, 2000, that offer did not satisfy the "written" requirement of Pa.R.C.P. 238(b)(1)(i). Thus, we conclude that Appellants should be awarded additional delay damages for the period from July 29, 2002, up to the date the jury rendered its verdict on May 9, 2003. We determine that the trial court did abuse its discretion by failing to award additional delay damages for the period July 29, 2002 to May 9, 2003, and accordingly we vacate the trial court's judgment, in relevant part, and remand the case for calculation of delay damages consistent with this opinion.

¶ 51 Having arrived at this interpretation, we must nevertheless still address Appellants' arguments, as there remains the period between October 7, 1999, the date of Appellee's $30,000 settlement offer, and July 29, 2002, the date Appellee was required but failed to set forth in writing the "express clause" that the offer was open for at least 90 days. If Appellants' arguments are correct, then this period would also be subject to delay damages.

■ ¶ 52 Appellants first argue that the trial court's finding that Appellee's October 7, 1999 settlement offer was kept open for at least 90 days is not based on the evidence.[30] We disagree. Appellants do not cite to anything in the record which contradicts the trial court's finding. Rather, Appellants simply revisit their first argument in this appeal, *i.e.* that Appellee failed to consummate a later settlement agreement by rejecting the limited release offered by Appellants, and by doing so, allegedly evidenced bad faith in its settlement negotiations. (*See* Appellants' Brief at 35). This argument actually reinforces the trial court's findings that Appellee's original settlement offer was left open for at least 90 days and that Appellee continued to negotiate a settlement, incrementally raising the offer to $187,500. Indeed, the record shows that the parties agreed to engage in settlement negotiations following the October 7, 1999 pre-trial conference, where Appellee tendered the $30,000 settlement offer, and that the parties were to report to the court by December 31, 1999, concerning the status of these negotiations. (Pre–Trial Conference Summary and Order of Court, dated October 7, 1999, at 1; R.R. at 48a). The record also shows that the parties agreed to postpone trial in order to engage in settlement negotiations during January and February 2000. (Docket at 3; R.R. at 8a). In March 2000, the parties commenced their efforts at mediation, during which Appellee made settlement offers of $150,000 (Youndt Affidavit at 3; R.R. at 112a); $180,000 (Letter

---

**30.** Appellants do not dispute the trial court's finding that Appellee tendered a written offer, as this offer was made before the court, placed on the record, and later set forth in a transcription of those proceedings. *See Arthur, supra* at 21, 682 A.2d at 1254 (holding that an oral settlement offer made before the court, on the record, and which is later transcribed in the notes of testimony, is the functional equivalent of a written offer for purposes of Rule 238).

dated April 4, 2000, from Appellee's attorney to Appellants' attorney, at 1, R.R. at 117a); and finally, on April 11, 2000, $187,500. (N.T., 10/20/00, at 92–93, R.R. at 204a–205a). Therefore, the trial court's findings that Appellee's settlement offer remained open and actually increased over the ensuing months is based on competent evidence of record. Appellants' argument to the contrary is therefore without merit.

¶ 53 Appellants also argue that the trial court erred by concluding that the jury verdict of $37,000 was within 125% of the $30,000 settlement offer because the trial court failed to consider the attorneys' fees and costs Appellants requested pursuant to Section 1305(f) of the STSPA, and which they may still receive upon remand. Appellants cite no authority for construing Rule 238 in this manner. Rule 238(b)(3) fails to specifically provide that plaintiff's recovery, when measured against the settlement offer, is to include an award of attorneys' fees and costs. It is certainly not the province of this Court to alter a Rule of Civil Procedure with such a breathtakingly broad reading. We determine that as Appellants' argument was without authority to support it, the trial court did not err in rejecting it.

¶ 54 Finally, Appellants argue that on remand, we give instruction that the case be assigned to a different trial judge, based on an alleged "hostility" demonstrated towards them by Judge Shaffer. Appellants point only to Judge Shaffer's refusal to award attorneys' fees as proof of such alleged hostility. This issue, however, was not raised in Appellants' statement of matters complained of on appeal, nor is it set forth in Appellants' brief in the section containing the statement of questions involved. We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved, Pa.R.A.P. 2116(a), and any issue not raised in a statement of matters complained of on appeal is deemed waived. *Commonwealth v. Castillo*, —— Pa. ——, ——, 888 A.2d 775, 780 (2005); *Commonwealth v. Lord,* 553 Pa. 415, 420, 719 A.2d 306, 309 (1998). Accordingly, we determine that Appellants have waived their request that the case be assigned to a different trial judge upon remand. However, we feel it incumbent to observe that nothing advanced by Appellants or present in the record would support the conclusion that Judge Shaffer exhibited hostility towards Appellants or acted in any manner that would require or militate in favor of his removal from the case.

¶ 55 For the foregoing reasons, we vacate, in part, the judgment of the trial court, and remand this matter with instructions to revisit the issues of attorneys' fees and costs and delay damages, and to arrive at a determination on these issues in a manner consistent with this opinion. In all other respects, the judgment is affirmed.

¶ 56 Affirmed in part; vacated and remanded in part. Jurisdiction relinquished.