J-S34032-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: Z.Z.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: I.H., FATHER | No. 180 EDA 2017 |

Appeal from the Order and Decree Entered December 2, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at Nos.: AP#CP-51-AP-0000527-2016
DP#CP-51-DP-0001542-2015
FID#51-FN-000614-2014

| | |
|---|---|
| IN THE INTEREST OF: J.T.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: I.H., FATHER | No. 181 EDA 2017 |

Appeal from the Order and Decree Entered December 2, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at Nos.: AP#CP-51-AP-0000529-2016
DP#CP-51-DP-0000769-2014
FID#51-FN-000614-2014

J-S34032-17

IN THE INTEREST OF: D.J.H., A MINOR | IN THE SUPERIOR COURT OF
PENNSYLVANIA

APPEAL OF: I.H., FATHER |

No. 182 EDA 2017

Appeal from the Order and Decree Entered December 2, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at Nos.: AP#CP-51-AP-0000528-2016
DP#CP-51-DP-0000642-2014
FID#51-FN-000614-2014

BEFORE: BOWES, J., SOLANO, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.: **FILED JULY 31, 2017**

In these consolidated appeals[1], I.H. (Father) appeals from the decrees

of the Court of Common Pleas of Philadelphia County, entered December 2,

2016, that terminated his parental rights to his children, Z.B. (d.o.b. 5/15),

D.H. (d.o.b. 10/12), and J.H. (d.o.b. 6/05) (Children) pursuant to 23

Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b), and the orders that changed

the Children's goals to adoption. We affirm.[2]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] This Court consolidated these appeals, *sua sponte*, on February 10, 2017.

[2] The trial court also terminated the parental rights of the Children's mother, L.B. (Mother) on December 2, 2016. Mother did not appeal that termination and she is not a party to this appeal.

- 2 -

Philadelphia's Department of Human Services (DHS) filed petitions to terminate Father's parental rights to the Children on June 9, 2016. The trial court aptly summarized the events that led DHS to file those petitions in its opinion entered January 26, 2017. We direct the reader to that opinion for the facts of this case.

The trial court held a hearing on DHS' petitions on December 2, 2016. Father was present at the hearing and represented by counsel. Mother was not present and the trial court found that DHS had made reasonable efforts to locate and serve her. (*See* N.T. Hearing, 12/02/16, at 5). In addition to Father, Community Umbrella Agency case manager, Frank Cervantes, testified at that hearing. The trial court entered its decrees terminating Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b) on December 2, 2016. Father filed his notices of appeal and statements of errors complained of on appeal on December 30, 2016.

Father raises the following questions on appeal:

1. Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa. C.S.A. sec. 2511(a)(1) without clear and convincing evidence of [F]ather's intent to relinquish his parental claim or refusal to perform his parental duties[?]

2. Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa. C.S.A. sec. 2511(a)(2) without clear and convincing evidence of [F]ather's present incapacity to perform parental duties[?]

3. Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa.C.S.A. sec. 2511(a)(5) without clear and convincing evidence to prove that reasonable efforts were made by [DHS] to provide [F]ather with additional

services and that the conditions that led to placement of the [C]hildren continue to exist[?]

4. Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa. C.S.A. sec. 2511(a)(8) without clear and convincing evidence that the conditions that led to placement of the [C]hildren continue to exist when [F]ather presented evidence of compliance with the goals and objectives of his family service plan[?]

5. Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 Pa. C.S.A. sec. 2511(b) without clear and convincing evidence that there is no parental bond between [F]ather and [the] [C]hildren and that termination would serve the best interest of the [C]hildren[?]

(Father's Brief, at 7).

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its

- 4 -

conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

Before we begin our analysis, we must discuss a shortcoming of Father's brief. In his third issue, Father claims that DHS failed to make reasonable efforts to provide him with services. (*See* Father's Brief, at 7). However, Father did not raise this issue in his statement of errors complained of on appeal and he has therefore waived it for our review.[3] *See* Pa.R.A.P. 1925(b)(4)(vii); *Yates v. Yates*, 963 A.2d 535, 542 (Pa. Super. 2008).

In regard to the other issues Father raises, we have examined the opinion entered by the trial court on January 26, 2017, in light of the record in this matter and are satisfied that that opinion is a complete and correct analysis of this case. (*See* Trial Court Opinion, 1/26/17, at 4-15) (finding:

---

[3] We also find that Father has waived any challenge to the change of permanency goal to adoption by his failure to raise the issue in the statement of questions involved. *See Krebs v. United Refining Co. of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) ("We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved.") (citing Pa.R.A.P. 2116(a)); (*see also* Father's Brief, at 7). Moreover, as Father failed to develop any argument about the change of permanency goal, he waived the issue. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (stating, "[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.") (citations omitted); (*see also* Father's Brief, at 10-14).

(1) Father has failed or refused to perform parental duties during six-month period before filing petition; (2) in spite of DHS providing Father with services, he is unwilling or unable to remedy causes of his incapacity to parent in order to provide Children with essential care, control, or subsistence necessary for physical and mental well-being; (3) Children have been in pre-adoptive home with Grandmother for significant period of time and cannot wait any longer for Father to summon the ability to parent; (4) Father is unable to provide evidence of his progress of his drug and alcohol and mental health programs, conditions that led to Children's removal still exist, and Father is not ready or able to parent Children full-time; and (5) Children do not have bond with Father and would not suffer irreparable harm if his rights are terminated).  Accordingly, we affirm the decrees of the Court of Common Pleas of Philadelphia County that terminated Father's parental rights, and orders that changed the Children's goals to adoption, on the basis of the concise, thoughtful, and well-written opinion of the Honorable Joseph Fernandez.

Decrees and orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/31/2017

## IN THE COURT OF COMMON PLEAS
## FOR THE COUNTY OF PHILADELPHIA
## FAMILY COURT DIVISION

In the Interest of Z.B., a Minor : CP-51-DP-0001542-2015
: CP-51-AP-0000527-2016

In the Interest of D.H., a Minor : CP-51-DP-0000642-2014
: CP-51-AP-0000528-2016

In the Interest of J.H., a Minor : CP-51-DP-0000769-2014
: CP-51-AP-0000529-2016
: FID: 51-FN-000614-2014
:
APPEAL OF: I.H., Father : 180/181/182 EDA 2017

**OPINION**

**Fernandes, J.:**

Appellant I.H. ("Father") appeals from the order entered on December 2, 2016, granting the petition filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Father's parental rights to Z.B. ("Child 1"), D.H. ("Child 2") and J.H. ("Child 3") (the "Children") pursuant to the Adoption Act, 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8) and (b). Lawrence O'Connor, Esq., counsel for Father, filed a timely Notice of Appeal with a Statement of Matters Complained of on Appeal pursuant to Rule 1925(b).

**Factual and Procedural Background:**

The family in this case became known to DHS on April 25, 2013, when DHS received a report that one of the Children's siblings was left outside alone and unsupervised. DHS enlisted the aid of a Community Umbrella Agency ("CUA") which began providing in-home services for the family. CUA developed a Single Case Plan ("SCP") with objectives for the family, which included necessary medical treatment for Child 2. On February 19, 2014, DHS received a report that Child 2 had not received necessary medical treatment. In a meeting with DHS, L.B. ("Mother"), mother of the Children, stated that Child 2 did not need the medical care, so she would not take him for his appointments. DHS removed Child 2 from the care of Mother and Father by urgent petition on March 13, 2014. Child 2 was adjudicated dependent on March 28, 2014, and fully committed to DHS custody. The trial court also ordered that DHS obtain an Order of Protective Custody for Child 3. Child 3 was taken into care on March 31, 2014, and adjudicated dependent on April 10,

2014. Both children were placed with their maternal grandmother ("Grandmother"). The trial court referred Father to the Clinical Evaluation Unit ("CEU") for a drug screen and monitoring due to his history of drug addiction, among other objectives. On May 16, 2014, Father tested positive for cocaine and opiates at CEU, and enrolled himself in an intensive outpatient program at Girard Medical Center, also known as the Goldman Clinic. On June 1, 2015, DHS received a report that Mother tested positive for drugs at Child 1's birth. Child 1 tested positive for cocaine. Child 1 was removed from Mother's care on June 9, 2015, and adjudicated dependent on August 13, 2015. Over the course of 2015 and 2016, Father did not successfully complete his SCP objectives of drug and alcohol treatment, employment, domestic violence counselling, stable housing and providing verification of his enrollment in programs. On June 9, 2016, DHS filed petitions to terminate Father's parental rights.

The goal change termination trial was held on December 2, 2016. The CUA case manager testified that the Children are all placed together in a pre-adoptive home with Grandmother, and have lived with her since they came into care. (N.T. 12/2/16, pg. 9). The CUA case manager testified that he had discussed Father's SCP objectives with him in person, during scheduled meetings. (N.T. 12/2/16, pg. 10). Father had been arrested on October 2, 2016, for possession of a controlled substance. Father told the CUA case manager that he had been arrested with drugs, but had only confiscated them from Mother during a fight with her drug dealer. Father and Mother may be in a relationship. (N.T. 12/2/16, pgs. 17-18). Father's SCP objectives are to engage in drug and alcohol treatment and mental health treatment, and to have bi-weekly supervised visits with the Children. (N.T. 12/2/16, pg. 19). Father's current housing is appropriate, but he has not provided a lease. (N.T. 12/2/16, pgs. 19-20, 48). Father's income is a combination of money given to him by family members and government benefits. (N.T. 12/2/16, pgs. 20-21). Father declined to address employment. Father has been enrolled in an intensive outpatient program with the Goldman Clinic since June 8, 2014. The Goldman Clinic has not provided CUA any treatment plans or records. The only paperwork provided by the clinic are drug screens, which CUA cannot even certify as random drug screens. All such screens are negative. (N.T. 12/2/16, pgs. 21-23). Father gave two positive drug screens for cocaine and opiates on February 29, 2016, and May 2, 2016, at the Goldman Clinic, but appealed these screens through the clinic's administrative process. The results of these screens were thrown out, but the clinic could not certify if this had

been actual testing error. (N.T. 12/2/16, pgs. 24-26). On or about November 9, 2015, Father provided a random drug screen to CEU which showed a high trace amount of cocaine, which was below the arbitrary cut-off level used to designate positive screens. (See DHS Exhibit 21). Father has provided fifty-five negative drug tests at the Goldman Clinic, but continues to be enrolled in the program. (N.T. 12/2/16, pg. 43). CEU reported in its February 18, 2016, report that per the Goldman Clinic, Father often missed treatment without notifying his counselor. (See DHS Exhibit 21). Father has consistently attended individual therapy and medication management at Cognitive Behavioral Health ("CBH"). Father is diagnosed with bipolar disorder, depression and heroin use disorder, and is prescribed medications for his diagnoses. (N.T. 12/2/16, pgs. 26-27). On February 19, 2016, Father was order to provide progress reports from his therapist, but he never did so. Father consistently attends bi-weekly visits with the Children, supervised by Grandmother at her home in Reading, Pennsylvania. Father missed several visits in September 2016. (N.T. 12/2/16, pg. 28). Father's visits were unsupervised, but in August 2016, a visit with Child 3 went poorly and they were changed back to supervised. (N.T. 12/2/16, pg. 29). During the visits supervised by CUA staff, Father needed prompting to engage with the Children, although Father completed parenting classes on December 15, 2015. The Children do not ask for Father and are not upset when he missed visits. (N.T. 12/2/16, pg. 31). Child 1 has never been in Father's care, and has no close relationship with him. Child 2 is confused by Father's presence and unsure whether he wants a relationship with Father. Child 3 does not have a good relationship with Father. (N.T. 12/2/16, pgs. 31-32). Father does not have a bond with the Children. Reunification with Father is not appropriate at this time, as the CUA case manager testified that Father would need successful overnight visits in order to allow the Children to adjust to his care. (N.T. 12/2/16, pgs. 32-33). The CUA case manager testified that Father may place the needs of Mother ahead of those of the Children. Mother only contacts CUA when in Father's presence. The Children would suffer no irreparable harm if Father's rights were terminated. They are adjusted to living with Grandmother. (N.T. 12/2/16, pg. 34). It is in their best interest to remain with Grandmother. The Children have a very strong bond and a loving, nurturing relationship with Grandmother. (N.T. 12/2/16, pg. 35). Child 3 is angry at Father for his repeated relapses into drug addiction. (N.T. 12/2/16, pg. 36). Child 3 is also angry when Father misses visits, because of the impact on the other Children. (N.T. 12/2/16, pg. 39). Father testified that he was arrested with drugs on his person because he had confiscated Mother's drugs in an effort to make her quit. Father was sentenced to a fine and

community service. (N.T. 12/2/16, pgs. 61-64). Father testified that he successfully appealed the positive screens at the Goldman Clinic, and they were thrown out. (N.T. 12/2/16, pgs. 65-67). Father testified that he missed visits because he could not afford transportation to Reading. Once CUA changed the method for providing transportation assistance, Father attended visits consistently. (N.T. 12/2/16, pg. 68). Father has been enrolled at CBH for nearly three years, and has been living in his current house since June 2016. (N.T. 12/2/16, pg. 72). On February 19, 2016, Father was ordered to provide a copy of his lease to CUA, but he has not done so. Father testified that one of the organizations he performed community service for had offered him a job, but had never called him again to begin his employment. (N.T. 12/2/16, pgs. 73-74). Father testified that Child 3 was an honor roll student when he lived with Father. (N.T. 12/2/16, pgs. 74-75). Father had concerns for the safety of the Children in Grandmother's home, because one of the family members who frequents the home had pulled a gun on him. (N.T. 12/2/16, pg. 77). Father testified that Grandmother's family smoke marijuana around the Children. (N.T. 12/2/16, pg. 78). The trial court found Father's testimony was not credible. (N.T. 12/2/16, pg. 88). Following argument, the trial court then terminated Father's parental rights to the Children under 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8) and (b), and changed their permanency goal to adoption.[1] On December 30, 2016, Father filed this appeal.

**Discussion:**

On appeal, Father alleges that the evidence was insufficient for the trail court to find, by clear and convincing evidence:

1. To change the goal to adoption and terminate Father's parental rights under 2511(a)
2. That changing the goal to adoption and termination best serves the child's physical and emotional needs and the welfare under 2511(b)

Father has appealed the involuntary termination of his parental rights. The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa.C.S.A. §2511(a), which provides the following grounds for Section 2511(a)(1):

(a) **General rule** - The rights of a parent, in regard to a child, may be terminated after a petition is filed on any of the following grounds:

---

[1] The trial court also terminated Mother's parental rights on the same date. Mother has not appealed.

(1) The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, has either evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

In proceedings to involuntarily terminate parental rights the burden of proof is on the party seeking termination, which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064 (Pa. 1994). To satisfy Section (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. However, the six-month time period should not be applied mechanically; instead, the court must consider the whole history of the case. *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue.

Petitions were filed as to Father on June 8, 2016. During the six-month period prior to the filing of the petitions, Father's outstanding SCP objectives were to engage in drug and alcohol and mental health treatment, and have bi-weekly supervised visits with the Children. (N.T. 12/2/16, pg. 19). By court order, Father had to complete employment and healthy relationships class for domestic violence. Father declined employment and never enrolled in healthy relationships as of a May 9, 2016, review hearing. (See DHS Petition for Involuntary Termination). Father has been enrolled in an intensive outpatient program of methadone maintenance with the Goldman Clinic since June 8, 2014. The Goldman Clinic has not provided CUA any treatment plans or records, except for drug screen results through CEU. All drug screens from the clinic are negative. (N.T. 12/2/16, pgs. 21-23, 43). Despite consistent attendance at the Goldman Clinic, Father remains at the intensive outpatient level of care, and has not been dropped down to outpatient during the two and a half years he has attended the clinic. During the six-month period, Father did not provide CUA any paperwork showing his progress in his treatment program, and has never indicated when he may successfully complete treatment. The record shows that on many occasions Father has been absent from treatment without justification or approval from his counselor. (See DHS Exhibit 21, CEU Report 2/18/16). Father tested positive for drugs twice during the six-month period, on

February 29, 2016, and May 2, 2016, but got these tests thrown out because of sloppy sample procedures by the Goldman Clinic. When the Goldman Clinic threw out the test results, it made clear that it was for procedural reasons, and could not certify that there had been any testing error at all. (N.T. 12/2/16, pgs. 24-26, 65-67). The record further shows that CUA and CEU last received any drug screen results from the Goldman Clinic on July 7, 2016. (N.T. 12/2/16, pg. 79). The trial court took judicial notice that on or about November 9, 2015, about four months prior to his February 2016 positive screen for cocaine at the Goldman Clinic, Father's CEU random drug screen showed high trace amounts of cocaine. It was labelled negative because the trace was below the arbitrary cut-off level. (See DHS Exhibit 21). Father did not have appropriate housing during the six-month period. (N.T. 12/2/16, pg. 72). Father consistently attended mental health treatment at CBH for his serious diagnoses. (N.T. 12/2/16, pgs. 26-27, 72). Father consistently attended bi-weekly visits with the Children, supervised by Grandmother at her home in Reading, Pennsylvania. (N.T. 12/2/16, pg. 28). During the visits supervised by CUA staff, Father needed prompting to engage with the Children. (N.T. 12/2/16, pg. 31). The trial court took judicial notice that Father completed parenting classes on December 15, 2015. Father may be in an intact relationship with Mother, who is currently addicted to drugs. The CUA case manager testified that Father may place the needs of Mother ahead of those of the Children. (N.T. 12/2/16, pgs. 17-18, 34, 55). During the six-month period, Father was engaged in all the necessary services. However, Father was still at an intensive outpatient treatment level at the Goldman Clinic, and never provided treatment records showing his progress or treatment plan at either the Goldman Clinic or CBH. Father was court ordered to provide a progress report from his therapist on February 19, 2016, but never did so. Father declined a job training program and did not enroll in healthy relationships class to address his domestic violence. Although Father completed a parenting class in 2015, he is not utilizing the skills he learned to improve his parenting with his Children during his bi-weekly supervised visits. As a result, he has failed or refused to perform parental duties during the six-month period. Because the trial court heard clear and convincing evidence to this effect, termination under this section was proper, and should be affirmed.

The trial court also terminated Father's parental rights under 23 Pa.C.S.A. §2511(a)(2). This section of the Adoption Act includes, as a ground for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect or refusal of the parent that causes the child

to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. This ground is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, but focuses more specifically on the needs of the child. *Adoption of C.A.W.*, 683 A.2d 911, 914 (Pa. Super. 1996).

Father's SCP objectives are to engage in drug and alcohol and mental health treatment, and to attend bi-weekly supervised visits with the Children. (N.T. 12/2/16, pg. 19). By court order, Father had to complete employment and healthy relationships class for domestic violence. Father declined employment and never enrolled in healthy relationships as of a May 9, 2016, review hearing. (See DHS Petition for Involuntary Termination). Father has been enrolled in an intensive outpatient methadone maintenance program with the Goldman Clinic since June 8, 2014. During the two and a half years this case has been open, and despite requests by CUA and orders of the trial court, the Goldman Clinic and Father have not provided CUA any treatment plans or records. The CEU was informed by the Goldman Clinic that Father often was absent from treatment without justification or approval from his counselor. (See DHS Exhibit 21, CEU Report 2/18/16). The only paperwork provided by the clinic are drug screens, which CUA cannot even certify as random drug screens. Father's last reported screen from the Goldman Clinic was July 7, 2016, six months before the trial. (N.T. 12/2/16, pgs. 21-23). Father tested positive for cocaine twice in February and May of 2016 at the Goldman Clinic. Father had those results thrown out due to the Goldman Clinic's inadequate sample-retention procedures. However, because of these sloppy procedures, no sample existed to be retested, so there was no way to determine whether those positive screens were actually in error. (N.T. 12/2/16, pgs. 24-26). The trial court took judicial notice that on or about November 9, 2015, about four months prior to his February 2016 positive screen for cocaine at the Goldman Clinic, Father's CEU random drug screen showed high trace amounts of cocaine. It was labelled negative because the trace was below the arbitrary cut-off level. (See DHS Exhibit 21). Subsequently, on October 2, 2016, Father was arrested for possession of a controlled substance. Father testified that he had been arrested with drugs, but had only confiscated them from Mother during a fight with her drug dealer. The trial court did not find Father's testimony credible. (N.T. 12/2/16, pgs. 17-18, 61-64, 88). As to his mental health, Father has consistently attended individual therapy and medication management at CBH. Father is diagnosed with bipolar

disorder, depression and heroin use disorder, and is prescribed medications for his diagnoses. (N.T. 12/2/16, pgs. 26-27, 72). Father was court ordered to provide a progress report from his therapist on February 19, 2016, but never did so. Father's current housing is appropriate, but he has not provided a lease as ordered on February 19, 2016. (N.T. 12/2/16, pgs. 19-20, 48). Father's only income is a combination of money given to him by family members and government benefits. (N.T. 12/2/16, pgs. 20-21, 73-74). Father has bi-weekly visits with the Children, supervised by Grandmother at her home in Reading, Pennsylvania. Father missed several visits in September 2016. (N.T. 12/2/16, pg. 28). Father's visits were unsupervised, but in August 2016, a visit with Child 3 went poorly and they were changed back to supervised. (N.T. 12/2/16, pg. 29). During the visits supervised by CUA staff, Father needed prompting to engage with the Children. (N.T. 12/2/16, pg. 31). Reunification with Father is not appropriate at this time, as the CUA case manager testified that Father would need successful overnight visits in order to allow the Children to adjust to his care. (N.T. 12/2/16, pgs. 32-33). Father has never parented Child 1. Child 2 is confused by Father's presence and unsure whether he wants a relationship with Father. Child 3 is angry with Father for his repeated relapses into drug addiction and missed visits. (N.T. 12/2/16, pgs. 31-32, 36, 39). The CUA case manager testified that Father may place the needs of Mother ahead of those of the Children. Mother only contacts CUA when in Father's presence, and they may be in a relationship. (N.T. 12/2/16, pg. 34). Child 2 and Child 3 have been in care for thirty-two months. Child 1 has been in care for eighteen months, his entire life. The Children need permanency, which Father cannot provide. He has engaged in services, but has not demonstrated progress which would place him in a position to parent the Children. In fact, the trial court heard evidence that his last drug screen at the Goldman Clinic was six months ago, that his visits were changed to supervised and that Father missed a month's worth of visits in September 2016. (N.T. 12/2/16, pg. 28). Because of Father's lack of progress and recent failures to meet his objectives, the trial court heard clear and convincing evidence that Father is unable or unwilling to remedy the causes of his incapacity to parent in order to provide the Children with essential parental care, control or subsistence necessary for their physical and mental well-being. Termination under this section was proper.

Father also appeals the trial court's termination of parental rights under 23 Pa.C.S.A. §2511(a)(5), which permits termination when a child was removed, by court order or voluntary agreement, and

placed with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond the period of time deemed as reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and after reasonable efforts for reunification have been made by the agency, which have been ineffective. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 508 (Pa. Super. 2004).

Child 2 and Child 3 have been in care for thirty-two months. Child 1 has been in care for eighteen months, his entire life. The Children were removed because Father abused drugs, had untreated mental health issues, unstable housing and domestic violence issues with Mother. Father's SCP objectives are to engage in drug and alcohol treatment and mental health treatment, and to have bi-weekly supervised visits with the Children. (N.T. 12/2/16, pg. 19). Additionally, the trial court ordered Father to complete an employment class, a healthy relationships class for domestic violence and provide documentation as he completed programs. As indicated at a May 9, 2016, review hearing, Father declined employment and never enrolled in the healthy relationships program. Father only completed parenting. (See DHS Petition for Involuntary Termination). Father has been enrolled in an intensive outpatient methadone maintenance program with the Goldman Clinic for two and a half years. Despite CUA's repeated requests and court orders, neither Father nor the Goldman Clinic has ever provided any treatment plans or records of Father's progress in the program. The CEU was informed that Father was often absent from treatment without justification or approval from his counselor. (See DHS Exhibit 21). The clinic has provided the results of drug screens, but these may not even be random drug screens. (N.T. 12/2/16, pgs. 21-23, 43). Father gave two positive drug screens for cocaine and opiates at the Goldman Clinic, but had the results of these screens thrown out. The clinic could not certify if

this had been actual testing error. (N.T. 12/2/16, pgs. 24-26, 65-67). The trial court took judicial notice that on or about November 9, 2015, about four months prior to his February 2016 positive screen for cocaine at the Goldman Clinic, Father's CEU random drug screen showed high trace amounts of cocaine. It was labelled negative because the trace was below the arbitrary cut-off level. (See DHS Exhibit 21). Father was arrested on October 2, 2016, for possession of a controlled substance. (N.T. 12/2/16, pgs. 17-18, 61-64). Father may be in an intact relationship with Mother, a drug addict, and may place her needs before the needs of the Children. (N.T. 12/2/16, pgs. 17-18, 34). Father has consistently attended individual therapy and medication management at CBH. Father is diagnosed with bipolar disorder, depression and heroin use disorder, and is prescribed medications for his diagnoses. (N.T. 12/2/16, pgs. 26-27). Father failed to provide a progress report from his therapist as ordered on February 19, 2016. Father's current housing is appropriate, but he has not provided a lease, as ordered by the trial court on February 19, 2016. (N.T. 12/2/16, pgs. 19-20, 48). Father's income is a combination of money given to him by family members and government benefits. Father testified that he was offered a job, but also testified that the potential employer never contacted him again. Consequently, he has no employment. (N.T. 12/2/16, pgs. 20-21, 73-74). Father consistently attended bi-weekly unsupervised visits with the Children. However, in August of 2016, a visit with Child 3 went poorly, and visits were changed to supervised. Following this change in visitation, Father missed a month of visits and has never asked for additional visits.(N.T. 12/2/16, pgs. 28-29). During the visits supervised by CUA staff, Father needed prompting to engage with the Children. The Children do not ask for Father and are not upset when he missed visits, though Child 3 is angry at Father for missing visits. (N.T. 12/2/16, pg. 31). DHS and CUA provided Father with appropriate referrals for services and made reasonable efforts towards reunification. Father is enrolled in some programs, but has either declined or failed to enroll in others. Father has not been able to demonstrate any progress in treating his drug addiction and mental health issues, despite consistent attendance for over three years and CUA and court-ordered requests for progress reports and treatment plans. Father is not in a position to parent, and his inability to provide evidence of his progress and the effectiveness of his drug and alcohol and mental health programs shows that he would be unable to remedy the conditions which brought the Children into care within a reasonable time. The Children do not have a good relationship with Father, and Child 3 is consistently angry with Father about Father's shortcomings as a parent and his drug addiction. (N.T. 12/2/16, pgs.

31-32, 36, 39). The Children are placed in a pre-adoptive home with Grandmother, and have a strongly-bonded, loving and nurturing relationship with her. Grandmother cares for their everyday needs. She has cared for Child 1 for his entire life, and has cared for Child 2 and Child 3 for thirty-two months. The Children are used to living in Reading with Grandmother, and it is in their best interest to terminate Father's parental rights. (N.T. 12/2/16, pgs. 9, 34-35). The Children cannot wait any longer for Father to summon the ability to parent. As a result, the trial court found that termination of Father's parental rights was in the best interest of the Children for their physical, intellectual, moral and spiritual well-being. Because the trial court made these determinations on the basis of clear and convincing evidence, termination under this section was also proper.

The trial court also terminated Father's parental rights under 23 Pa.C.S.A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 938 A.2d 1128, 1133 (Pa. Super. 2009). The party seeking termination must also prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love, comfort, security and stability. *In re Bowman*, A.2d 217 (Pa. Super. 1994). See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

Child 2 and Child 3 have been in care for thirty-two months. Child 1 has been in care for eighteen months, his entire life. The Children were removed because Father abused drugs, had untreated mental health issues, unstable housing and domestic violence issues with Mother. Father's SCP objectives are to engage in drug and alcohol treatment and mental health treatment, and to have bi-weekly supervised visits with the Children. (N.T. 12/2/16, pg. 19). Father was court ordered to complete an employment class and take a healthy relationships class, but he never enrolled. Father only completed parenting. Father has been enrolled in an intensive outpatient methadone

maintenance program with the Goldman Clinic for two and a half years. Despite CUA's repeated requests and court orders, neither Father nor the Goldman Clinic has ever provided any treatment plans or records of Father's progress in the program. The CEU received information that Father often missed his treatment without justification or explanation. (See DHS Exhibit 21). The clinic has provided the results of drug screens, but these may not even be random drug screens. (N.T. 12/2/16, pgs. 21-23, 43). Father gave two positive drug screens for cocaine and opiates at the Goldman Clinic, but had the results of these screens thrown out. The clinic could not certify if this had been actual testing error. (N.T. 12/2/16, pgs. 24-26, 65-67). The trial court took judicial notice that on or about November 9, 2015, about four months prior to his February 2016 positive screen for cocaine at the Goldman Clinic, Father's CEU random drug screen showed high trace amounts of cocaine. It was labelled negative because the trace was below the arbitrary cut-off level. (See DHS Exhibit 21). Father was arrested on October 2, 2016, for possession of a controlled substance. (N.T. 12/2/16, pgs. 17-18, 61-64). Father may be in an intact relationship with Mother, a drug addict, and may place her needs before the needs of the Children. (N.T. 12/2/16, pgs. 17-18, 34). Father has consistently attended individual therapy and medication management at CBH. Father is diagnosed with bipolar disorder, depression and heroin use disorder, and is prescribed medications for his diagnoses. (N.T. 12/2/16, pgs. 26-27). On February 19, 2016, Father was ordered to provide a progress report from his therapist, but he has not done so. Father's current housing is appropriate, but he has not provided a lease, as ordered on February 19, 2016. (N.T. 12/2/16, pgs. 19-20, 48). Father's income is a combination of money given to him by family members and government benefits. Father testified that he was offered a job, but also testified that the potential employer never contacted him again. Father is not employed. (N.T. 12/2/16, pgs. 20-21, 73-74). Father consistently attended bi-weekly unsupervised visits with the Children. However, in August of 2016, a visit with Child 3 went poorly, and visits were changed to supervised. Following this change in visitation, Father missed a month of visits, and has not asked for additional time or make-up visits. (N.T. 12/2/16, pgs. 28-29). During the visits supervised by CUA staff, Father needed prompting to engage with the Children. The Children do not ask for Father and are not upset when he missed visits, though Child 3 is angry at Father for missing visits. (N.T. 12/2/16, pg. 31). Father has not demonstrated that his drug and mental health treatments have placed him in a position to parent the Children. Father is unable to provide evidence of his progress and the effectiveness of his drug and alcohol and mental health programs.

The conditions which led to the Children's removal still exist. The Children are placed in a pre-adoptive home with Grandmother, and have a strongly-bonded, loving and nurturing relationship with her. Grandmother cares for their everyday needs. She has cared for Child 1 for his entire life, and has cared for Child 2 and Child 3 for thirty-two months. The Children are used to living in Reading with Grandmother, and it is in their best interest to terminate Father's parental rights. (N.T. 12/2/16, pgs. 9, 34-35). Father is not ready or able, as of the time of trial, to parent the Children full-time. Father is unable to provide safety and meet the needs of the Children. As a result, the trial court found that termination of Father's parental rights was in the best interest of the Children for their physical, intellectual, moral and spiritual well-being. The trial court found the testimony of DHS's witness credible. Because the trial court made these determinations on the basis of clear and convincing evidence, termination under this section was also proper.

After a finding of any grounds for termination under Section (a), the court must, under 23 Pa.C.S.A. §2511(b), also consider what - if any - bond exists between parent and child. *In re Involuntary Termination of C.W.S.M. and K.A.L.M.*, 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship". *In re Adoption of T.B.B.* 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. *In re K.Z.S.* at 762-763. However under 23 Pa.C.S.A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care, if found to be beyond the control of the parent.

Father consistently attended bi-weekly unsupervised visits with the Children. However, in August of 2016, a visit with Child 3 went poorly, and visits were changed to supervised. Following this change in visitation, Father missed a month of visits. Throughout the life of this case, Father has never had more than bi-weekly visits, whether supervised or unsupervised. (N.T. 12/2/16, pgs. 28-29). During the visits supervised by CUA staff, Father needed prompting to engage with the Children. The Children do not ask for Father and were not upset when he missed visits, though

Child 3 is angry at Father for missing visits as it impacts his brothers. (N.T. 12/2/16, pg. 31). The Children do not have a good relationship with Father. Child 3 is consistently angry with Father about Father's shortcomings as a parent and his failure to overcome his drug addiction. Child 2 is confused by Father's inconsistent presence in his life. Child 1 has never lived with Father and has never received parental care from him. (N.T. 12/2/16, pgs. 31-32, 36, 38-39). The Children would not suffer any irreparable harm if Father's rights were terminated. (N.T. 12/2/16, pg. 34). The Children are placed in a pre-adoptive home with Grandmother, and have a strongly-bonded, loving and nurturing relationship with her. Grandmother cares for their daily needs. She has cared for Child 1 for his entire life, and has cared for Child 2 and Child 3 for thirty-two months. The Children are used to living in Reading with Grandmother, and it is in their best interest to terminate Father's parental rights. (N.T. 12/2/16, pgs. 9, 34-37). Consequently, the court did not abuse its discretion when it found that it was clearly and convincingly established that termination of Father's parental rights would not destroy an existing beneficial relationship.

Father also alleges that the court erred in changing Child's permanency goal from reunification to adoption. In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*, 763 A.2d 873 (Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as one of its primary purposes. *In the Interest Of R.P. a Minor*, 957 A.2d 1205 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply the instructions received. *In re R.T.*, 778 A.2d 670 (Pa. Super. 2001). The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Father has serious mental health diagnoses and a history of drug abuse. He was referred for treatment to address these issues, and has been enrolled for nearly three years. (N.T. 12/2/16, pgs. 21-22, 26-27). The trial court did not hear any evidence that Father's treatment programs were actually improving his ability to parent the Children. Father is unable to provide documentation of his progress and the effectiveness of his drug and alcohol and mental health treatment programs. Father has declined employment and still does not have a job. (N.T. 12/2/16, pgs. 20-21, 73-74).

Father has not enrolled in the court-ordered health relationships program. Father has not provided a copy of his lease, as order on February 19, 2016. Father prioritizes Mother's needs instead of completing his SCP objectives to provide permanency to the Children. (N.T. 12/2/16, pgs. 17-18, 34). Father has never had more than bi-weekly visits. An unsupervised visit with Child 3 went badly, and Father's visits were changed to supervised. Following this change, Father missed a month's worth of visits and has not asked for additional or make-up time. (N.T. 12/2/16, pgs. 28-29). During the visits supervised by CUA staff, Father needed prompting to engage with the Children. The Children do not ask for Father and were not upset when he missed visits, though Child 3 is angry at Father for missing visits, as it impacts his brothers. (N.T. 12/2/16, pgs. 31, 38-39). The relationship between Father and the Children has soured over time. (N.T. 12/2/16, pg. 31-32, 36, 39). The Children are placed in a pre-adoptive home with Grandmother, and have a strongly-bonded, loving and nurturing relationship with her. Grandmother cares for their everyday needs. She has cared for Child 1 for his entire life, and has cared for Child 2 and Child 3 for thirty-two months. Grandmother provides for all the Children's needs. The Children are used to living in Reading with Grandmother, and it is in their best interest to remain with her so they may be adopted. (N.T. 12/2/16, pgs. 9, 34-37). The Children need permanency, which Father cannot provide at this time. Because these facts were clearly and convincingly established by the credible testimony of DHS's witness, the court's change of permanency goal from reunification to adoption was proper.

**Conclusion:**

For the aforementioned reasons, the court found that DHS met its statutory burden by clear and convincing evidence regarding termination of Father's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8) and (b) since it would best serve the Children's emotional needs and welfare. Changing the Children's permanency goal to adoption was in their best interest. The trial court's termination of Father's parental rights and change of permanency goal to adoption was proper and should be affirmed.

By the court,

Joseph Fernandes J.