J-A28044-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: I.J.N., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.M.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 874 MDA 2021 |

Appeal from the Decree Entered June 4, 2021
In the Court of Common Pleas of York County Orphans' Court at No(s):
2021-0003A

BEFORE: LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:          **FILED: JANUARY 7, 2022**

Appellant, J.M.N. ("Father"), appeals from the decree entered on June 4, 2021, in the York County Court of Common Pleas, which granted the petition of Child's mother, A.F.N. ("Mother"), and future stepfather, C.V. ("Future Stepfather"), and involuntarily terminated his parental rights to his minor son, I.J.N., born in March of 2016 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), and (b).  After a careful review, we affirm.

Mother and Father married in April of 2017, and they separated on October 8, 2017.  N.T., 6/3/21, at 7-8, 35, 58.  In connection with their divorce, Mother and Father entered into a property settlement agreement, dated April 7, 2018, which contained custody provisions providing Mother sole

---

* Former Justice specially assigned to the Superior Court.

legal and physical custody of Child.  *Id.* at 9-10. Pursuant to this agreement, while Mother was to encourage communication between Father and Child, including virtual communication, Mother was afforded the right to decline communication if deemed not in the best interests of Child.  *Id.* at 11.

Shortly after his separation from Mother, Father was arrested related to a robbery on November 17, 2017.  *Id.* at 11-12, 76-77.  Father was released from incarceration on December 5, 2017, and, as a condition of his bail, he went immediately to Clarity Way Rehab, which is rehabilitation facility in Hanover, Pennsylvania.  *Id.* at 77.  Father was ordered to remain at the rehabilitation facility until January 8, 2018.  *Id.*

Thereafter, from January 16, 2018, to mid-January of 2019, Father resided in a sober living facility in Florida.  *Id.* at 78-79.  On February 1, 2019, Father then turned himself in to begin serving a five-to-ten-year sentence of imprisonment, with an effective date of December 5, 2018.[1]  *Id.* at 72, 80.

Notably, Father has not seen Child since his separation from Mother in October of 2017.  *Id.* at 9, 58, 77, 96.  Aside from a card and package of snacks, until his incarceration almost a year and a half later, Father communicated with Child for a total of approximately one hour via FaceTime

---

[1] Since his incarceration, Father has been moved from Cumberland County Prison to SCI Camp Hill to SCI Coal Township, and, finally, to SCI Chester. N.T., 6/3/21, at 80-88.  Although Father remained incarcerated at the time of the relevant termination hearing, it is unknown if Father currently remains incarcerated, as he hoped to be released to a state drug treatment program. *Id.* at 73.

and telephone calls. *Id.* at 13. Thereafter, during his incarceration, Father began contact with Mother via letter, and he then engaged in email contact with Mother in February of 2020. *Id.* at 22.

Mother and Future Stepfather[2] filed a petition for the involuntary termination of Father's parental rights on January 8, 2021, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). They also filed a contemporaneous petition seeking Future Stepfather's adoption of I.J.N. Amended petitions were filed on March 10, 2021.

The trial court conducted a hearing on June 3, 2021. Father, who was incarcerated at SCI Chester, was represented by counsel and participated remotely via Zoom. *Id.* at 71. Child was represented by legal counsel. Mother and Father each testified on their own behalf.[3] At the conclusion of the hearing, the trial court announced its determination to terminate Father's parental rights.[4] *Id.* at 129. ("Because we find that the Petitioners here have met their burden of proving by clear and convincing evidence both the requirements of Section (a)(1) and Section [b], the court finds it appropriate

_____

[2] Mother and Future Stepfather had an intended wedding date of October 16, 2021. Amended Petition for Adoption, 3/10/21, at ¶¶1.a., 1.b.

[3] Due to the COVID-19 pandemic, counsel for Father, as well as counsel for Child, participated in the termination hearing remotely via Zoom. *Id.* at 1. We note that counsel for Child during this proceeding was substitute counsel. *Id.* at 3.

[4] Counsel for Child filed a brief with this Court in favor of this position.

to terminate [Father]'s parental rights.].").  The trial court issued a decree memorializing its determination to terminate Father's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(1), and (b).  Thereafter, on June 29, 2021, Father, filed a timely notice of appeal, along with a contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  On July 20, 2021, the trial court filed a Rule 1925(a) Opinion indicating that it adequately addressed Father's issues in rendering its decision at the conclusion of the hearing.

On appeal, Father raises the following issue for our review: "Did the lower [c]ourt abuse its discretion and/or err as a matter of law as the Petitioner failed to meet its burden to terminate Father's parental rights under 23 Pa.C.S.[A.] Section 2511(a)(1) and 2511(b)?"[5]  Father's Brief at 5.

In matters involving the involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." ***In re Adoption of S.P.***, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)].  "If the factual findings are supported,

---

[5] While we observe that Father states his issue differently than in his Rule 1925(b) Statement, we nevertheless find that he preserved a challenge to the trial court's decree.  However, to the extent Father raises several other issues in his Rule 1925 Statement, which are not included in his Statement of Questions Involved, we deem these issues to be waived.  ***See Krebs v. United Refining Co.***, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues).

appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

***In re T.S.M.***, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> ***
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
>> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. **Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.**
>>
>> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted) (emphasis added).

As it relates to the crucial six-month period prior to the filing of the petition, this Court has instructed, "[I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case." *In re D.J.S.*, 737 A.2d

283, 286 (Pa.Super. 1999) (citations omitted). This requires the Court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citation omitted).

Further, we have stated:

[T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa.Super. 2010) (citation omitted). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa.Super 2008) (*en banc*).

Regarding the definition of "parental duties," this Court has stated:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. **A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.** Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d at 855 (internal citations omitted) (emphasis added).

Critically, incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. *In re Adoption of S.P.*, 47 A.3d at 828 (discussing *In re Adoption of McCray,* 460 Pa. 210, 331 A.2d 652 (1975)).

In the case *sub judice*, in finding grounds for termination of Father's parental rights pursuant to Section 2511(a)(1), the trial court reasoned that Father's attempts at communication were neither consistent nor of a nature that were aimed at maintaining a relationship with Child. N.T., 6/3/21, at 122-24, 127. The trial court further observed that, despite Father's assertions of periods of difficulty communicating due to the COVID-19 pandemic, Father's actions and communication patterns were similar prior to the pandemic. *Id.* at 125-27. Moreover, recognizing that Father had visitation and contact with another one of his children, the trial court identified that Father did not file a

custody petition with the trial court seeking visitation of the subject child. *Id.*

at 124-25. The trial court stated:

>      [I]ncarceration in and of itself is not grounds to terminate parental rights under Section (a)(1), but it is a factor to be considered, and in considering the factor, we don't ignore the responsibilities of a parent during a period of incarceration. They have a responsibility to continue, as the Court says, to utilize those resources at his or her command while in prison.
>
>      No doubt [Father] used one of those resources available to him by sending emails to [Mother], and many of which do make reference to [I.J.N.] and his well-being. The [trial] court has had the opportunity to review these emails fairly thoroughly, even during the course of the proceeding, and if I were to describe the overall theme of the email, it is that [Father] inquires about [I.J.N.]. [Mother] responds to most of them in a fairly prompt fashion and provides a response, but the type of inquiries that are made aren't -- are not what the [trial] [c]ourt would consider the type of inquiries we would expect to see of a parent wanting to know about their child's well-being. . . .
>
>      Given the length of time that [Father] had not seen his child, we would expect to see more -- some more detailed questions about the child's medical conditions, whether he's been getting checkups, how he's growing, how tall he is, how much he weighs, you know, things that happen in the course of a child's life, any milestones that may be going on, so that [Father] could use that information garnered in the emails to communicate with [I.J.N.], even if it were through [Mother].
>
>      And, you know, I can't say that the communication is completely without message to [I.J.N.]. . . .But the tone of the email strikes me as more the tone of that – that you may inquire of a cousin or a niece or a nephew -- Hey, how are things going? Anything new happening? -- not the types of questions that I would expect to see, again, from a father that wants to maintain a close relationship with the child.
>
>      And [Father] points [to] two times when [Mother] did not respond to his emails or respond promptly, and there are those, but there are times when she responded very promptly, there are times when she responded to, you know, an email string, and there are times where [Father] emailed and there was some time that went by without a response and there was no follow-up to

that email to see why he had not gotten a response. So that's certainly part of what the [trial] [c]ourt is considering in determining whether [Father] has utilized all of those resources at his command while in prison.

I note a couple other things, one is which in a[n] August 11, 2020, email, [Father] stated that, today, he had a video visit [with respect to his older son]. . . . So, clearly, he was capable at that point in time of having video visits. And [Father], in response to that, says, [b]ut she wouldn't let me.

. . .Any parent who is not satisfied with the custody situation at any time has the right to petition the [trial] court and ask for a change in the custody situation. If [Father] wasn't happy with the fact that he was [] being told he couldn't have telephone calls, couldn't have video visits, he had the ability to petition for custody and ask for that. You know, he need not be in a position to say, I want to take on physical custody of the child. He can simply petition for visitation.

And we do understand that [Father] is incarcerated, but it's the [trial] court's experience that incarcerated individuals in Pennsylvania have a pretty fair access to the legal system to file filings, whether it be family related, civil related, or criminal related, and I've not heard any testimony today of a specific barrier that was placed in front of [Father] that would have prevented him from filing a custody action within the six months prior to the filing of the petition.

Let me also say that the [trial] court does understand that there were COVID conditions, that there were lockdowns that [Father] dealt with in communicating, and I'm not going to go so far as to say during these time frames when he couldn't attempt to call or he couldn't send an email, it was his obligation to send a letter. But the time frame of those lockdowns, first of all, is outside the six months that I am to primarily examine.

And I think it also -- given sort of the uniqueness of those COVID lockdowns that everyone dealt with, I think it's then fair to not just look at the six months, but to look at the track record that [Father] had prior to the six months immediately preceding the petition, and, again, not because that's what the statute directs, but to look and see whether there was a change in pattern, say, since 2019 when [Father] began his period of incarceration to -- and then different for 2020, and the reality is there wasn't a change.

His behavior during the COVID period was fairly consistent with his behavior prior to the COVID period, and that is to say he was not completely inactive or completely absent from communication. He did have communication, but it was not regular communication and it was not communication directed at fostering a relationship with [I.J.N.].

. . .

THE COURT: So I spoke to the emails and the overall tone of the emails, and in addressing that, one thing I did forget to address is -- I want to address specifically the email of November 26, 2020, and that email clearly -- again, he says, I want to wish [I.J.N.] a happy Thanksgiving. That's several words of the email.

The remainder of the paragraph of the email goes on to talk about his relationship with [Mother] and how he hopes they can be friends someday and really is not directed at all towards [I.J.N.] and finding information out about or sharing information with [I.J.N.]. And that's, again, one specific email, but I did note that there was a tone that the communication was directed more towards [Mother] than towards [I.J.N.] and, again, fostering that close relationship with [I.J.N.].

I don't think anyone here would disagree with me when I say this is not a--an easy case to decide. This is not the typical case that we may see. The burden here is on the Petitioners, and they have a high burden. They have a burden of showing by clear and convincing evidence that they've established the grounds under [S]ection 2511(a)(1), but as I look at the evidence as a whole, I do have to find that they have established the grounds under (a)(1) by clear and convincing evidence inasmuch as [Father] has failed to perform his parental duties, even given the limitation of his incarceration, for a period of six months prior to the petition being filed.

N.T., 6/3/21, at 122-28.

On appeal, Father contends the trial court's determination was not based on clear and convincing evidence. Father asserts that his interaction with Child has been constrained due to substance abuse issues and incarceration for which he has acknowledged and taken responsibility.

Father's Brief at 19. He notes that he maintained contact with Mother and Child when permitted during his time in rehabilitation. *Id.* Further, upon his subsequent incarceration, he wrote several letters to Mother, eventually receiving a response indicating that she would not allow contact with Child. *Id.* at 19-20. Father describes that his "options as to what he could do were limited." *Id.* at 20. Nevertheless, while "cho[osing] to respect Mother's wishes with respect to contact with the minor child," Father avers that he continued to send correspondence to Mother inquiring as to Child.[6] *Id.* Further, he has been emailing Mother since February of 2020. *Id.* at 21. As to any lapses in communication, Father points to the COVID-19 pandemic. *Id.* at 21-22.

Father explains:

It is understood that caselaw states that a person must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship or his rights may be forfeited. It is argued that Father did this. A review of the obstacles are as follows. Father acknowledged that he was responsible for actions which resulted in his incarceration. However, Mother failed to acknowledge the obstacles she placed in Father's path and the [l]ower [c]ourt failed to give sufficient weight to this. Mother moved from the marital residence and never gave a new address to Father. This is undisputed. Did Father quit trying? No. Father responded to this by sending letters to Mother's place of employment.

Mother tells Father that she will not permit him to have contact with the minor child. Again, did Father quit trying? No.

---

[6] Given Child's young age, Father argues that sending correspondence to Mother, and not Child, was reasonable. N.T., 6/3/21, at 20.

- 13 -

Father responded by continuing to keep in contact with Mother and asking how the child was. . . .

*Id.* at 22 (citation omitted).

Lastly, Father suggests that it was not practical to file a custody petition. "In its decision in this action, the [l]ower [c]ourt noted that Father failed to file a custody [p]etition. In theory Father could have done this. However, this was not a practical option. That requires an inmate to understand the custody procedure in the home county of the child. Additionally, there were certain limitations on what he could do while in prison due to the covid virus.

*Id.* at 24.

Upon review, the record supports termination pursuant to Section 2511(a)(1). As indicated *supra*, incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. ***In re Adoption of S.P.***, 47 A.3d at 828.

Here, the record reveals that Father has not seen Child since October of 2017, when Child was approximately a year and a half old. N.T., 6/3/21, at 58, 77, 96. He only had contact with Child for a total of approximately one hour over the next year and a half. *Id.* at 13. Father acknowledged that he could have made better efforts to communicate with Child during this time and confirmed that he wrote, in part, "I tried to live my life happily, knowing it was a matter of time before I would have to serve time." *Id.* at 97.

Moreover, Father has been incarcerated since February of 2019, and he is serving a five-to-ten-year sentence with a minimum date of December 5,

- 14 -

2023. *Id.* at 72, 80. He maintained communication with Mother through letter[7] and then email, which included general inquiry regarding Child.[8] *Id.* at 22-23, 39. Despite any denial of contact with Child related to Father's incarceration,[9] *id.* at 39, 43, Father admitted that Mother did not prohibit him from writing to Child, who would have been almost three years old at the time Father began to serve his sentence and was approximately five years old at the time of the filing of the amended petition. *Id.* at 99. Father, however, sent no additional cards or gifts for birthdays or holidays directly to Child.[10]

---

[7] These letters were sent to Mother at her work address as Mother moved and did not provide Father her new address. *Id.* at 30, 42-43. Father, however, had Mother's telephone number, which did not change. *Id.* at 28.

[8] Father blamed any lapses in communication on COVID-19, as well as his transfer to different prison facilities. *Id.* at 86-89.

[9] Pursuant to a letter dated June 22, 2019, Mother indicated that she would not allow communication with Child while Father was incarcerated but offered Father to write Child "as much as you want." Respondent's Exhibit 1; *see also* N.T.,6/3/21, at 39, 43 ("There are various risk factors [Child] can face if he communicates with you while you're in prison. Due to your historical lack of communication prior to incarceration, I will not allow it now. . . . [Y]ou are more than welcome to write to him as much as you want. I know he is not able to read now, but he will be able to before you get out. I can assure you I will not get rid of them."). Significantly, Mother indicated that Child suffered "meltdowns" due to the inconsistent contact with Father prior to his incarceration. N.T., 6/3/21, at 19. Mother further explained that prison is a difficult concept for a young child to understand. *Id.* at 18.

[10] As recognized by Mother, Father acknowledged birthdays and holidays in his emails. *Id.* at 49-50. We observe that Father distinctively directly addressed Child related to his birthday in a March 5, 2021, email, which was subsequent to the filing of the original termination petition and just prior to the filing of the amended termination petition. *See* Petitioners' Exhibit 5.

*Id.* at 32, 91-92. Further, he did not inquire about writing a letter directly to Child until March 5, 2021.[11] *Id.* at 30.

Mother testified she did not receive a letter for Child from Father.[12] *Id.* at 31. Similarly, although noting he would like to have telephone calls and visitation with Child, while Mother's telephone number is on his approved list, Father confirmed that he did not attempt to call Child, and he failed to file a custody petition requesting telephone calls and/or visitation. *Id.* at 100. Finally, and significantly, Father also conceded that a release in December 2021 to a state drug treatment program is speculative. *Id.* at 105-07 (confirming that he was not eligible for the drug treatment program at the time of the hearing and that there is "no guarantee" that he will be admitted to the program.).

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Upon review, we conclude the trial court's termination of Father's

---

[11] Significantly, this was subsequent to the filing of the original termination petition and just prior to the filing of the amended termination petition.

[12] When asked, Father could not recall whether he wrote any letters directly to Child. *Id.* at 101-02.

parental rights pursuant to Section 2511(a)(1) is supported by competent, clear, and convincing evidence in the record. *See In re T.S.M.*, 71 A.3d at 267; *In re Adoption of T.B.B.,* 835 A.2d at 394. We are mindful of our standard of review set forth above, and reiterated in *S.P.*, and, most recently, in *In re S.K.L.R.*, ___ Pa. ___, 256 A.3d 1108 (2021), and that we must not substitute our judgment for that of the trial court.

Because Father failed to act affirmatively in order to maintain a relationship directly with Child, regardless of any obstacles or circumstances created by Mother, or Father himself, we find that grounds for termination under Section 2511(a)(1) are met. *See B., N.M.*, 856 A.2d at 855 (explaining that a parent "must exercise reasonable firmness in resisting the obstacles" which limit his or her ability to maintain a parent/child relationship). As we discern no abuse of discretion, we do not disturb the trial court's findings. Thus, Father's claim fails.

We next determine whether termination was proper under Section 2511(b). As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.* [*a/k/a E.W.C. & L.M. a/k/a L.C., Jr.*], [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the

- 17 -

parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

> Moreover,
>
> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quotation marks, quotations, and citations omitted).

In finding that Child's best interests favor termination pursuant to Section 2511(b), the trial court reasoned as follows:

That doesn't end the [trial] [c]ourt's inquiry. We are then required to look at Section [b] of 2511, which says, "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical, and emotional needs and welfare of the child."

In looking at those factors, specifically developmental, physical, and emotional, [I.J.N.] here has gone from being, I'll say, roughly a year-and-a-half old to roughly five years old without any meaningful inclusion of his father in his life, and at this point, the termination of [Father]'s parental rights would not affect the developmental needs and welfare of [I.J.N.].

As far as physical and emotional needs and welfare, [Father] has been unable to attend to any of [I.J.N.]'s physical needs, again, since the onset of his incarceration and really even before that as a result of his inpatient rehab. And so [I.J.N.]'s physical needs and welfare are not affected by the termination of [Father]'s parental rights.

And as far as the emotional needs and welfare, again, there's been no indication that [I.J.N.] looks to [Father] for comfort or for care or for, you know, affirmation or for congratulations when he's done something well, because, again, of the lack of accessibility, really, and accordingly, we must find

that the petitioners have also met their burden of proof with respect to section [b].

N.T., 6/3/21, at 128-29 (some brackets in original).

Father, however, argues that Mother prevented a bond between him and Child. Father's Brief at 26-27. He further maintains that, while his acceptance into the state treatment program is unknown, "he has done what he can do." *Id.* at 27. He suggests that his parental rights were improperly terminated mainly because of his incarceration. *Id.* at 27-28.

As to Section 2511(b), upon review, we likewise discern no abuse of discretion. The record supports the finding that Child's developmental, physical, and emotional needs and welfare favor termination of parental rights

pursuant to Section 2511(b). **See T.S.M.**, 620 Pa. at 628, 71 A.3d at 267. Child has not seen Father since October of 2017, and he has had no contact with Father since 2018. N.T., 6/3/21, at 9, 58, 77, 96. Father missed numerous milestones in Child's life. **Id.** at 15-18, 33. Mother testified that Child does not know who Father is, and instead believes that Future Stepfather is his father. **Id.** at 15, 17, 33.

> Q. Would [I.J.N.] recognize his father at this point?
> A. No.
> Q. Who does he consider to be his father?
> A. [Future Stepfather].

**Id.** at 15. Mother reported that Child never asks about Father, and there is no parent-child bond. **Id.** at 31, 33. Notably, Father admitted to a lack of a relationship with Child. **Id.** at 95-96. As a result, when asked what Child wants, Mother stated, "[Child] refers to [Future Stepfather] as his dad if he's asked. He wants the family to be an entire family. His pictures that he draws of his family include [Future Stepfather]. It's just -- it's [Future Stepfather], me, and the three kids, and that's his family."[13] **Id.** at 34.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decree affirmed.

---

[13] Aside from Child, Mother has two older children from a separate biological father. **Id.** at 7-8.

Judge Lazarus joins the memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/7/2022